No. 3--04--0961

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2005

In
 
re
 T.S-P., ) Appeal from the Circuit Court

a Minor ) of the 10th Judicial Circuit,

 ) Peoria County, Illinois,

(The People of the State of )

Illinois, )

 )

Petitioner-Appellee, ) No. 03--JA--100

 )

v. )

 ) 

Amber P., ) Honorable

                                ) Timothy M. Lucas,

Respondent-Appellant). ) Judge, Presiding.

_________________________________________________________________

JUSTICE SCHMIDT delivered the opinion of the court:

_________________________________________________________________

The trial court adjudicated the minor, T.S-P., to be neglected because of an injurious environment (705 ILCS 405/2--3(1)(b) (West 2002)).  On appeal, the respondent mother, Amber P., argues that the trial court erred by finding T.S-P. to be neglected.  We affirm.

BACKGROUND

T.S-P. was born on August 28, 2003.  On November 20, 2003, the State filed an amended juvenile petition alleging that the minor was neglected, in that her environment was injurious to her welfare.  Specifically, the petition alleged: 

"(A) her parents were previously indicated by DCFS for death by neglect and malnutrition in June of 2002; and

(B) this minor's mother was breast feeding the minor's 
deceased sibling, [M.S-P.], in early 2002, and the mother was smoking cannabis 3 times per day while breast feeding; and

(C) the mother was told by her pediatrician in early 2002 that she needed to supplement breast milk with formula and the mother failed to follow the directions and when that baby, [M.S-P.], died, [M.S-P.] was undernourished; and

(D) on 8/14/03, the father grabbed the mother by the neck and punched her on the leg at a time when he was intoxicated and she was pregnant; and

(E) on 6/4/02, the mother tried to commit suicide; and

(F) the father has convictions for '99 possession of drug paraphernalia and '94 possession of cannabis and the mother has a '96 domestic battery and retail theft; and

(G) the mother has a history of depression and had made suicide attempts or gestures and self-mutilations prior to June 4, 2002; and

(H) after the death of [M.S-P.], the mother continued to use cannabis and this minor was born

cannabis-positive."

T.S-P.'s father answered the petition on December 11, 2003.  He admitted the allegations in paragraphs (A), (E), (F), and (G).  Regarding paragraph (B), the father admitted that the respondent was breast-feeding M.S-P. at the time M.S-P. died, but denied the remainder of paragraph (B).  Concerning paragraph (C), the father admitted that the respondent was told by her pediatrician to supplement breast milk with formula, but that she did not do so.  However, the father alleged that he fed formula to M.S-P. on several occasions.  He denied the remainder of the allegations in paragraph (C).  The father admitted that the respondent was pregnant on August 14, 2003, but denied the remainder of the allegations in paragraph (D).  Regarding paragraph (H), the father neither admitted nor denied that the respondent continued to use cannabis after M.S-P.'s death, and denied that T.S-P. was born cannabis positive because the minor's urine sample tested negative for cannabis.

On January 12, 2004, the respondent answered the petition.  She denied paragraphs (B), (C), and (D), with the exception that she admitted that she was pregnant on August 14, 2003, when "there was a verbal argument between her and the father."  The respondent admitted the allegations in paragraphs (A), (E), (F), and (G), with the exceptions "that she did not know about the 1994 possession of cannabis conviction of the father," and "that episodes of self-mutilation did not occur except for a suicide attempt."  She stated that she lacked sufficient knowledge to either admit or deny the allegations in paragraph (H).

The trial court held the hearing concerning the petition on March 16, 2004.  At the beginning of the hearing, the State submitted several exhibits.  These documents showed that M.S-P. was born on February 1, 2002, at a weight of 2,265 grams and a length of 47 centimeters.  M.S-P. died on March 5, 2002.  Dr. Kent Harshbarger conducted an autopsy on M.S-P.'s body on March 6, 2002.  At the time of the autopsy, M.S-P.'s body was 49 centimeters long and weighed 2000 grams.  Harshbarger wrote the following summary in the autopsy report:

"The cause of death is undetermined but likely related to poor nutritional support.  The decedent was underweight and actually under the birth weight despite an increase in length.  ***  The sudden death of an infant under one year of age which remains unexplained after a thorough case investigation *** falls under the classification of 'SIDS'.  In my opinion, this case does not fit the classification due to the underweight status but the cause of death remains undetermined."

The State's exhibits documented the respondent's history of mental health problems.  A hospital report from May 3, 1997, stated that the respondent had contemplated committing suicide by inhaling car exhaust.  The respondent said that she had been diagnosed with depression at the age of 14.  This report listed the respondent's self-mutilations in the form of cigarette and lighter burns, cuts on the arms and stomach, and a wound inflicted with a sewing needle to the left ankle.  The respondent reported that she had attempted suicide by an overdose of drugs on an unspecified earlier date.

On July 31, 1997, the respondent cut her left wrist superficially with a small knife.  She told the hospital staff that she did not want to hurt or kill herself, but that things were not working out in her life.

On June 4, 2002, the respondent attempted suicide by ingesting alcoholic beverages and an overdose of ibuprofen.  She said that she had attempted suicide because of her grief over M.S-P.'s death.

The State's exhibits also concerned a variety of other allegations in the petition.  Hospital documents showed that before being discharged from the hospital after M.S-P.'s birth, the respondent was advised by the pediatrician to supplement breast feeding with formula.

A hospital report stated that the respondent said she had a fight with the father on August 14, 2003, in which he yelled at her, grabbed her by the neck, threw her to the floor, and punched her on her left thigh and the left side of her abdomen.  The respondent told the hospital staff that the father had been drinking.  The staff also said that there were no visible bruises on the respondent.

A lab report from the Illinois State Police showed that 1.3 grams of plant material found on the respondent's person, which was submitted to the lab on March 8, 2002, tested positive for cannabis.  The respondent's urine samples tested positive for cannabis on August 15 and 18, 2003.  A meconium sample collected from T.S-P. on August 29, 2003, tested positive for cannabis.

At the hearing, Michael Eddlemon testified that he was a detective with the Peoria police department.  During Eddlemon's investigation of M.S-P.'s death, he spoke with the respondent on March 5, 2002.  The respondent told Eddlemon that she stopped smoking marijuana during her pregnancy with M.S-P., but had been smoking approximately "[t]hree one-hitters" of marijuana per day beginning about a week after M.S-P.'s birth.  T.S-P.'s father testified that the respondent told him she smoked marijuana once a few weeks before T.S-P.'s birth.

The respondent told Eddlemon that she fed M.S-P. with breast milk supplemented with formula until she ran out of the formula supplied to her by the hospital.  She told Eddlemon that after she ran out of formula, "she was pretty much exclusively breast feeding."  She said that she could not remember the pediatrician instructing her to supplement breast feeding with formula.  The respondent told Eddlemon that she had made arrangements to obtain a breast pump, but had not received it.

Officer Earnest McCall stated that on August 14, 2003, he went to the respondent's apartment to investigate the altercation between the respondent and the father.  The respondent told McCall that the father was "very intoxicated and they got into a verbal argument."  McCall remembered that the respondent said the father had choked her and had either kicked or punched her.

The father testified that he and the respondent had an argument on August 14, 2003.  He denied both being intoxicated and touching the respondent during the incident.  However, in rebuttal, McCall stated that when he arrived at the residence, the father appeared to be intoxicated because of "[the father's] slurred speech and unstableness standing up."

The trial court announced its decision on September 28, 2004.  The court found paragraphs (A), (E), and (F) to have been proved because of the admissions of the respondent and the father in their answers to the petition.  The court said that paragraph (B) was proved because of Eddlemon's testimony about the respondent admitting smoking marijuana and the Illinois State Police lab test showing the respondent's possession of marijuana.

Regarding paragraph (C), the court found that the father confirmed that the respondent was instructed by the pediatrician to supplement breast feeding with formula.  The hospital records also showed that the respondent had been so instructed.  Additionally, the autopsy report indicated the likelihood that M.S-P. died of malnutrition.  The court found, therefore, that paragraph (C) had been proved.

Concerning paragraph (D), the court found McCall's testimony to be more credible than the father's testimony.  The court reviewed the other documentary evidence concerning the domestic violence incident on August 14, 2003, and determined that the paragraph had been proved.

The court found paragraph (G) to have been proved by the documentation of the respondent's history of depression, suicide attempts and gestures, and self-mutilations prior to June 4, 2002.  Regarding paragraph (H), the court considered the exhibits showing the respondent's positive urine tests for cannabis and the positive test of T.S-P.'s meconium sample in determining that the paragraph had been proved.

Next, the court stated that there was a nexus between the past environment in the home and the environment for T.S-P.  The court identified three specific issues that showed this nexus, which were (1) the respondent's history of mental health problems; (2) the recent domestic violence incident; and (3) the history of drug use in the home.  The court found "that with the backdrop of the circumstances surrounding [M.S-P.] that there is *** a nexus *** with respect to the proper parenting of children, and *** that with the more recent incidences *** with respect to those three specific issues that there is an environment that is injurious to the welfare of [T.S-P.]"  The court adjudged, therefore, that T.S-P. was neglected.

The trial court made T.S-P. a ward of the court and appointed the Department of Children and Family Services as the child's guardian.  The respondent now appeals only from the trial court's order adjudicating the minor to be neglected.

ANALYSIS

The respondent contends that the trial court erred by adjudicating T.S-P. to be neglected because of an injurious environment.  Specifically, the respondent submits that, with the possible exception of paragraph (H), the allegations in the State's juvenile petition concerned events that occurred prior to T.S-P.'s birth and therefore did not concern the minor's environment.  Furthermore, the respondent asserts that the theory of anticipatory neglect did not apply in this case because there was no nexus between the State's allegations of a past injurious environment for M.S-P. and T.S-P.'s environment at the time of the amended petition.

A child may be found neglected if her environment is injurious to her welfare.  705 ILCS 405/2--3(1)(b) (West 2002).  
The State has the burden of proving allegations of neglect by a preponderance of the evidence.  
In re Faith B.
, 216 Ill. 2d 1, 832 N.E.2d 152 (2005)
.
  On review, the trial court's finding of neglect will not be reversed unless it was against the manifest weight of the evidence, which means that the opposite conclusion was clearly evident.  
Faith B.
, 216 Ill. 2d 1, 832 N.E.2d 152
.

Generally, the neglect of a juvenile is defined as a failure to exercise the care that the circumstances warrant.  
In re Arthur H.
, 212 Ill. 2d 441, 819 N.E.2d 734 (2004).
  Neglect includes wilful as well as unintentional disregard of duty, and takes its meaning from the context of the surrounding circumstances.  
Arthur H.
, 212 Ill. 2d 441, 819 N.E.2d 734
.  Although an injurious environment does not have a fixed definition, it includes the breach of a parent's duty to ensure a safe and nurturing shelter for the minor.  
Arthur H.
, 212 Ill. 2d 441, 819 N.E.2d 734
.

The theory of anticipatory neglect is dependent upon the concept of an injurious environment.  
Arthur H.
, 212 Ill. 2d 441, 819 N.E.2d 734
.  Although the neglect of one child does not conclusively show the neglect of another child, the neglect of one minor is admissible as evidence of the neglect of another minor under a parent's care.  
Arthur H.
, 212 Ill. 2d 441, 819 N.E.2d 734
; 705 ILCS 405/2--18(3) (West 2002).  Anticipatory neglect should take into account not only the circumstances surrounding the previously neglected sibling, but also the care and condition of the child named in the petition.  
Arthur H.
, 212 Ill. 2d 441, 819 N.E.2d 734
.  Under the theory of anticipatory neglect, when faced with evidence of prior neglect by parents, the juvenile court should not be forced to refrain from acting until another child is injured.  
In re S.S.
, 313 Ill. App. 3d 121, 728 N.E.2d 1165 (2000).

In this case, the record shows that T.S-P.'s environment was injurious to her welfare because of the respondent's mental health problems, the domestic violence in the home, and the illegal drug use in the home.  These factors showed a failure by T.S-P.'s parents to exercise the care warranted by the presence of a newborn child.  The parents exhibited both a wilful and an unintentional disregard of their duty toward the newborn, as well as a failure to ensure a safe and nurturing shelter for the infant.

Furthermore, evidence that the parents had neglected to provide adequate nutrition for M.S-P., leading to the infant's death, was admissible as evidence concerning an injurious environment for T.S-P.  In considering this evidence, the trial court correctly took into account not only the circumstances surrounding the neglect of M.S-P., but also the care and condition of T.S-P.  After M.S-P. was neglected, the trial court was not required to refrain from acting until T.S-P. was injured.  See 
S.S.
, 313 Ill. App. 3d 121, 728 N.E.2d 1165.

Under the circumstances of this case, we cannot say that the opposite conclusion from the trial court's ruling was clearly evident.  We hold that it was not against the manifest weight of the evidence for the trial court to adjudge T.S-P. to have been neglected because of an injurious environment.  Therefore, we affirm the judgment of the Peoria County circuit court.

Affirmed.

HOLDRIDGE and LYTTON, JJ., concur.