FIFTH DIVISION
June 30, 2006

No. 1-05-4012

| | | |
|---|---|---|
| In re Sharena H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 05 JA 365 |
| | ) | |
| v. | ) | |
| | ) | |
| Sharon H., | ) | Honorable |
| | ) | Richard Stevens, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE O'BRIEN delivered the opinion of the court:

Respondent, Sharon H., appeals the order of the circuit court adjudicating her minor daughter, Sharena, neglected due to an injurious environment and being born drug-exposed. Respondent also appeals the dispositional order making Sharena a ward of the court. On appeal, respondent contends that: (1) the State is barred by laches from filing a petition for neglect; (2) the court's finding of neglect was against the manifest weight of the evidence; (3) the court erred in considering evidence that Sharena was exposed to domestic violence while living with respondent; and (4) the court erroneously stated in its written order that it had made a finding of abuse. We affirm.

Respondent gave birth to Sharena on October 30, 2002. At the time of Sharena's birth, respondent was married to Alonso H. DNA testing revealed that he is not Sharena's biological father. Another man, Renard H., was alleged to be the father, but there is no finding of paternity against him.

Sharena was born exposed to cocaine, opiates, and marijuana. The Illinois Department

of Children and Family Services (DCFS) did not immediately take custody of Sharena upon her birth, even though she was born drug-exposed. Instead, DCFS opened an intact family case and offered family preservation services to respondent.

Two-and-one-half years later, on April 5, 2005, the State filed a petition for adjudication of wardship and motion for temporary custody of Sharena. The State's petition alleged that Sharena was neglected because she was born drug-exposed in October 2002, Sharena's environment was injurious to her welfare, and Sharena was abused because there was a substantial risk of injury to her.

At the adjudicatory hearing, DCFS caseworker Angela Foster testified that she was assigned to respondent's case on December 3, 2002, after respondent gave birth to Sharena, who tested positive for drugs. Ms. Foster met with respondent on December 3, 2002, at respondent's home. Sharena's alleged father, Renard H., was also present. Respondent told Ms. Foster that she had been using drugs for 15 years, specifically, cocaine, heroin, marijuana, and methadone. She was currently using heroin while also involved in a methadone program. Respondent was receiving methadone six days a week from an agency called "New Age Services." Respondent told Ms. Foster that the agency had offered outpatient drug treatment, but she was not interested in such treatment.

Ms. Foster testified that in December 2002, respondent was assessed for substance abuse services through Gateway. Gateway recommended inpatient drug treatment. Respondent refused to attend inpatient treatment because she did not have anyone to look after Sharena and she refused to utilize the daycare services provided by Gateway. Ms. Foster also referred

respondent to inpatient treatment at Women's Treatment Center, which would have allowed Sherena to stay with respondent. Respondent refused to go.

Ms. Foster testified that in December 2002, respondent completed assessment at Gateway for outpatient drug treatment. She was scheduled to begin treatment in January 2003. However, she was noncompliant with attendance. Respondent's methadone treatment at New Age Services was terminated because she tested positive for drugs in November and December 2002 and because she was inconsistent in picking up her methadone.

Ms. Foster testified that in January 2003, respondent went to Women's Treatment Center for detoxification and was scheduled to enter their inpatient treatment. Respondent completed detoxification but did not enter inpatient treatment. Respondent returned to Gateway for outpatient treatment, but her attendance was inconsistent and she never completed the program. In February 2003, respondent told Ms. Foster that she wanted to leave Chicago because it was difficult for her to remain clean in the area in which she lived. Ms. Foster advised respondent to enter inpatient treatment and then transfer to a recovery home, which would take her outside her drug-infested neighborhood. Respondent again refused inpatient treatment.

Ms. Foster testified that she scheduled a staffing meeting with respondent in February 2003 to discuss her treatment and lack of progress. Respondent missed the first staffing and Ms. Foster scheduled another. At the staffing, respondent stated that she wanted to be drug-free. Ms. Foster attempted to draw up a contract with respondent outlining her service requirements, but respondent would not agree to the contract because "she said that she didn't need the help." Respondent still did not consistently attend treatment after the staffing.

Ms. Foster testified that she lost contact with respondent in March 2003. Ms. Foster left messages on respondent's cellular phone, went to her home and left notes, and went to respondent's cousin's house, where she had briefly lived. Finally, respondent called Ms. Foster in early April 2003 and left her a message that she was living in Murphysboro, Illinois. Ms. Foster spoke with respondent soon afterwards, and respondent told her that living in southern Illinois would make it easier to stay off drugs. Ms. Foster contacted DCFS in southern Illinois and a case was opened for respondent there.

On cross-examination by the Cook County Public Guardian (Public Guardian), Ms. Foster testified that she had recommended that respondent attend individual counseling to address her traumatic past. According to Ms. Foster, respondent had suffered much abuse in her life. She had been involved in a violent domestic relationship, witnessed the abuse of her mother by her natural father, and witnessed her father murder her brother. However, respondent refused counseling.

On cross-examination by respondent, Ms. Foster testified that when she was assigned the case, Sharena appeared adequately cared for. Ms. Foster also testified that before respondent moved to Murphysboro, there was an incident in which respondent became angry with Sharena's alleged father, Renard H., because he was drinking with some friends and would not give her anything to drink. Respondent tried to hit him, and Renard grabbed her by the neck to keep her from attacking him. Respondent told Ms. Foster that one of the reasons she wanted to leave Chicago was because she was afraid of Renard H. On re-cross-examination by the Public Guardian, Ms. Foster testified that Renard eventually moved to Murphysboro with respondent.

The trial court admitted two casenotes written on August 20, 2003, and September 23, 2003, by a DCFS caseworker in southern Illinois, Alicia Butler. The August 20, 2003, casenote states that Ms. Butler went to respondent's home and found it clean and that respondent told her there were no problems with Sharena. Respondent also told Ms. Butler that she knew drug treatment was important and that she would be going soon. The September 23, 2003, casenote detailed another home visit by Ms. Butler, and it stated that Sharena was doing well and had bonded with respondent, and that the home had adequate food. Ms. Butler again discussed drug treatment with respondent, and respondent stated she was willing to engage in treatment.

DCFS caseworker Rodney Jackson testified the case was transferred to him from the Murphysboro office on December 1, 2004. On the day he was assigned to the case, he made a home visit to respondent, but she was not there. Mr. Jackson called respondent on December 7 and set up an appointment with her for December 17. On December 17, respondent cancelled, claiming that she was stuck in Wisconsin in a snowstorm. Respondent did not leave a number where she could be reached, and her phone was disconnected. Mr. Jackson testified that he went to respondent's home several times to find her, but she was never there. Mr. Jackson left letters at her home, but she never called him. In February 2005, Mr. Jackson performed a diligent search for respondent but could not locate her. In March 2005, Mr. Jackson's supervisor told him to close the case, based on their failure to locate respondent.

DCFS caseworker Gloria Crosby testified that she was assigned to the case on April 1, 2005, after DCFS received a hotline report claiming that respondent was using drugs and that her home in Bellwood was dirty and had no food. Ms. Crosby went to respondent's home on April 1.

Respondent was there with her husband and Sharena. Sharena was wearing a T-shirt with no pants or underwear and her hair was unkempt. She appeared healthy and normally developed.

When Ms. Crosby arrived at the home, respondent was talking on her cellular phone. Sharena told respondent she was hungry, but respondent did not respond to her. Sharena began to cry, fell on the floor, and started screaming. Respondent stepped over her and continued speaking on the cellular phone.

Ms. Crosby testified that she told respondent about the hotline report, and she asked respondent to show her the apartment. Respondent showed her the apartment, but would not allow her to see one of the bedrooms. The living room and kitchen were clean, and there was adequate food in the house. Ms. Crosby asked respondent to submit to a urine drop, but she refused, claiming that she had to go collect rent from her tenants in a building in Chicago. Ms. Crosby told her that they needed to rule out the allegation in the hotline report that respondent was using drugs, but respondent told Ms. Crosby that she had been clean for two years.

Ms. Crosby testified that she explained to respondent the need for a safety plan to protect Sharena. Respondent agreed to let her take Sharena to her office where a safety plan could be put in place and respondent's niece could pick her up. Ms. Crosby drove Sharena to her office, and her supervisor told her to take protective custody of Sharena. At that point, Ms. Crosby and her supervisor spoke with respondent by telephone. Respondent agreed to the protective custody, but wanted Sharena placed with her niece. Respondent told Ms. Crosby that she had just smoked a joint and drunk some wine.

Respondent called Larry Walker to testify. Mr. Walker was a tenant in the home that

respondent owned on Christiana Street in Chicago. He and his fiancée babysat for respondent occasionally. Mr. Walker testified that he had never seen respondent use drugs, and that Sharena seemed normal and healthy on the occasions that he saw her.

Margaret Walls testified next for respondent. Ms. Walls was an in-home caretaker for respondent's husband. She was at his house four days a week. She saw respondent interact with Sharena. Ms. Walls testified that she had never seen respondent use drugs. Ms. Walls observed Sharena to be healthy, and she described respondent as a good mother.

Sherrice Hays, respondent's niece, testified that she has temporary custody of Sharena. She never saw respondent using drugs, but she heard that respondent had used heroin. Ms. Hays saw respondent either high or drunk two years prior to the hearing. However, she had never seen respondent high or drunk around Sharena. Respondent and Sharena lived with Ms. Hays for a while. Ms. Hays testified that respondent acted appropriately with Sharena and she never saw any signs of abuse. Ms. Hays thought that Sharena was a smart child and that she was healthy.

Respondent testified on her own behalf. She stated that she started using drugs when she was 23 years old. At the time of adjudication, she was 42 years old. Respondent claimed that she started using drugs after a boyfriend forced her to smoke cocaine and use heroin. When she was 26, she left the boyfriend but continued to use heroin once a month. When she was 28, she met her husband and they moved out of town. She did not use drugs for two years, but started using again when she was 30 because she and her husband were not getting along and she was "hanging around the wrong crowd." She claimed to use drugs sporadically between the ages of 30 and 35.

Respondent acknowledged that Sharena was born drug-exposed. Respondent admitted that she used cocaine, heroin, and marijuana in the eighth month of her pregnancy. DCFS required her to go to drug treatment and she started outpatient treatment at Gateway in December 2002. Respondent relapsed and stopped going to treatment. At that point, she decided she needed inpatient treatment. In January 2003, she went into a detox program at Women's Treatment Center. She successfully completed two weeks of detoxification. Respondent testified that after detoxification, she left treatment and did not continue inpatient treatment because her counselors were "talking about [her] business to each other," making fun of her, and causing her to feel uncomfortable.

Respondent testified that she decided to leave Chicago because there were drug sales going on in front of her house. She moved to Carbondale, Illinois. Respondent claimed that she told DCFS worker Angela Foster that she was moving, and that Ms. Foster approved the move. Respondent arrived in Carbondale in March 2003 and called Alicia Butler, a DCFS worker who had been referred to her by Ms. Foster. Respondent stated that she went on her own to a treatment center in Carbondale, was assessed, and was supposed to begin treatment within about two months. She testified that she had a negative drug drop in February 2003.

Respondent testified that DCFS told her that the treatment center she went to on her own was not affiliated with DCFS and that DCFS would have to refer her to another treatment center. In August 2003, she went to another treatment center referred to her by DCFS and received an assessment there. She claimed that she had a negative drug drop there. Respondent testified that DCFS in Carbondale was slow in helping her and that she repeatedly tried, to no avail, to get

additional help from them.

Respondent testified that she left Carbondale in April 2004 without ever having received any treatment there. She notified her caseworker, Ms. Butler, that she was leaving and asked that her case be transferred to Chicago. Respondent claimed that she never heard from anyone at DCFS from April 2004 to December 2004. At the time, she was renting a room from her brother-in-law. Respondent testified that she started using drugs again in April 2004. She testified that she only used drugs once a month, because she was taking Xanax due to a nervous condition related to her finding her deceased mother in her home in Mississippi in January 2004.

Respondent testified that DCFS worker Rodney Jackson called her in December 2004 and she arranged to meet with him on December 17. Respondent was unable to attend the meeting because her car broke down. She claimed that she called Mr. Jackson on the meeting date, but he had left work. She claims he did not return her call.

Respondent testified that during this same general time period (November and December 2004), Sharena's alleged father, Renard, became verbally abusive toward her and also shoved her and started to "swing fists" at her. Respondent went to Wisconsin to get away from him. She testified that she obtained an order of protection against him in February 2005.

Respondent testified that her next contact with DCFS was on April 1, 2005, when DCFS caseworker Gloria Crosby came to her house while she was on the phone talking to one of her tenants about a problem at the building she owned. Ms. Crosby told her about the hotline call claiming that respondent was using drugs and not taking care of Sharena. Respondent told Ms.

Crosby that the hotline report was not true. Ms. Crosby asked her to take a urine drop, and respondent told her that she was too busy at the moment dealing with her tenant. Respondent agreed to a safety plan whereby Ms. Crosby would drive Sharena to her office, and respondent's niece would then pick her up there. Respondent admitted that after Ms. Crosby drove Sharena to her office, respondent talked to Ms. Crosby on the phone and told her that she had just smoked marijuana.

After hearing the evidence, the trial court found that Sharena was neglected because she was born drug-exposed. The court also made a finding of neglect due to injurious environment.

The dispositional hearing was held on November 14, 2005. Joel Savoy, a supervisor from the Association House, testified that respondent completed inpatient treatment at Women's Treatment Center on August 7, 2005. She started outpatient treatment in October 2005. Respondent took a urine drop on October 25, 2005, and the results were negative. Respondent had not started individual therapy yet, as they were waiting on the mental health assessment. This was not respondent's fault.

Mr. Savoy testified that respondent visited Sharena once a week in visits supervised by the foster parent. Sharena was doing well and had adjusted to her placement. Mr. Savoy testified that it was in Sharena's best interests that she be made a ward of the court, as respondent needed more time to engage in services to become a better parent.

Respondent testified that she completed inpatient treatment and that she attended outpatient treatment for three hours per day, Monday through Thursday. Respondent testified that she had four weeks of domestic violence counseling while in inpatient treatment.

No. 1-05-4012

After hearing the evidence, the trial court adjudicated Sharena a ward of the court. Respondent filed this timely appeal.

First, respondent contends that laches prevents the State from filing its neglect petition, as the State waited to file the petition until more than two years after DCFS opened the case. Respondent waived review by failing to raise the issue in the trial court. In re Nau, 153 Ill. 2d 406, 417 (1992).

On the merits, laches is an equitable doctrine that precludes the assertion of a claim by a litigant whose unreasonable delay in raising that claim has prejudiced the opposing party. Tully v. Illinois, 143 Ill. 2d 425, 432 (1991). The doctrine is grounded in the equitable notion that courts are reluctant to aid a party who has knowingly slept on his rights to the detriment of the opposing party. Tully, 143 Ill. 2d at 432. Two elements are necessary to find laches: (1) lack of diligence by the party asserting the claim; and (2) prejudice to the opposing party resulting from the delay. Tully, 143 Ill. 2d at 432.

Where, as here, respondent seeks to apply the defense against a governmental entity, courts have expressed a reluctance to impose laches unless the respondent can show unusual, extraordinary, or compelling circumstances. City of Chicago v. Alessia, 348 Ill. App. 3d 218, 229 (2004). This is so because laches may impair the functioning of the governing body in the discharge of its functions and, thus, adversely affect the public. Alessia, 348 Ill. App. 3d at 229. Further, mere nonaction of government officers does not support a claim of laches. Alessia, 348 Ill. App. 3d at 229. Rather, a positive act must have been taken by such officers, inducing the action of the respondent under the circumstances and making it inequitable to permit the

˘11˘

governmental entity to retract what its officers had done. Alessia, 348 Ill. App. 3d at 229.

In the present case, respondent has not shown that the State's delay in filing its neglect petition was due to a lack of diligence by either the State or DCFS. After Sharena was born exposed to drugs, DCFS opened an "intact family" case and tried to preserve her family. Respondent was given multiple opportunities to engage in treatment and counseling to address her drug addiction. Specifically, Gateway recommended inpatient treatment for respondent two months after Sharena was born. Respondent would not comply. Respondent was referred to an inpatient program at the Woman's Treatment Center. She would not go. Respondent attended outpatient treatment at Gateway, but she stopped going because she relapsed. Respondent went into a detoxification program in January 2003. After the program, she was scheduled to go into inpatient treatment, but she refused to go.

In February 2003, respondent informed her DCFS caseworker, Ms. Foster, that she had decided to leave Chicago. In March 2003, Ms. Foster lost touch with respondent and was unable to locate her for a month, despite leaving notes at her residence, calling her, and going to another address where she had previously lived. Finally, respondent called Ms. Foster in April 2003 and told her that she was living in Murphysboro. DCFS opened a case for respondent in southern Illinois. The downstate DCFS worker visited respondent's home and discussed with respondent the need for her to attend drug treatment. However, respondent returned to Chicago in April 2004 without ever participating in treatment.

Respondent admitted to using drugs between April and December 2004. In December 2004, DCFS caseworker Rodney Jackson contacted respondent and made an appointment to

˘12˘

meet with her on December 17. Respondent cancelled the meeting and did not leave a contact number. Mr. Jackson went to her residence, left her notes, but respondent never called. In March 2005, DCFS closed the case because it could not locate respondent and therefore could not facilitate services.

Respondent was later located on April 1, 2005, after a hotline report came in alleging that she was using drugs and that her house was dirty and had no food. DCFS caseworker Sharon Crosby went to respondent's home that same day and asked to be shown the apartment. Respondent showed her the living room, kitchen, and a bedroom, but refused to show her the other bedroom. Respondent also refused to comply with a urine drop, and DCFS subsequently took protective custody of Sharena. Ms. Crosby spoke with respondent by telephone, and respondent told her that she had just "smoked a joint and drank some wine". Four days later, the State filed its petition for adjudication of wardship.

All of this evidence shows that neither the State nor DCFS sat on its rights but, rather, allowed respondent many opportunities to preserve her family and get the help she needed to treat her drug problem. Respondent refused to do so. Accordingly, respondent has failed to establish a lack of diligence on the part of either DCFS or the State, and therefore her laches defense fails.

Next, respondent contends that the court erred in finding that Sharena was neglected. In general, "neglect" is the failure to exercise the care that circumstances justly demand and encompasses both wilful and unintentional disregard of parental duty. In re Edward T., 343 Ill. App. 3d 778, 794 (2003). The term is not one of fixed and measured meaning, but takes its

No. 1-05-4012

content from the specific circumstances of each case.  In re M.K., 271 Ill. App. 3d 820, 826 (1995).

The State must prove the allegations of neglect by a preponderance of the evidence.  In re Edward T., 343 Ill. App. 3d at 794.  The reviewing court gives deference to the trial court's findings of fact as the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence.  In re Edward T., 343 Ill. App. 3d at 794.  The reviewing court will not reverse the trial court's finding of neglect unless it is against the manifest weight of the evidence.   In re Edward T., 343 Ill. App. 3d at 794.

The trial court found that Sherena was neglected under section 2-3(1)(c) of the Juvenile Court Act of 1987 due to being born exposed to drugs.  Section 2-3(1)(c) states:

"(1) Those who are neglected include:

* * *

(c) any newborn infant whose blood, urine, or meconium contains any amount of a controlled substance as defined in subsection (f) of Section 102 of the Illinois Controlled Substances Act, as now or hereafter amended, or a metabolite of a controlled substance, with the exception of controlled substances or metabolites of such substances, the presence of which in the newborn infant is the result of medical treatment administered to the mother or the newborn infant[.]" 705 ILCS 405/2-3(1)(c) (West 2004).

The trial court's finding was not against the manifest weight of the evidence, where

˘14˘

respondent admitted that Sharena was born exposed to controlled substances. Respondent contends, though, that the neglect finding was error, because the petition for adjudication of wardship was filed over two years after Sharena was born, and there was no evidence that Sharena was exposed to controlled substances at the time the petition was filed.

Respondent's contention of error is without merit. The trial court correctly noted that "if a minor's born exposed to controlled substances, that's neglect. It doesn't say, 'if two years goes by before there is a petition filed, then it's not neglect.' There is nothing like that in there." Moreover, as discussed above, the delay in filing the petition was due to DCFS' efforts to preserve respondent's family. When respondent repeatedly failed to capitalize on the opportunities offered to her to treat her addiction, culminating in a hotline report that she was using drugs and a refusal to submit to a urine drop, the State filed the petition charging respondent with neglect for giving birth to a baby exposed to controlled substances. As discussed, the evidence supported the charge; accordingly, the finding of neglect was not against the manifest weight of the evidence.

Respondent also contends that the trial court erred in finding neglect under section 2-3(1)(b) of the Juvenile Court Act of 1987 based on an injurious environment. Section 2-3(1)(b) states:

"(1) Those who are neglected include:

* * *

(b) any minor under 18 years of age whose environment is injurious to his or her welfare[.]" 705 ILCS 405/2-3(1)(b) (West 2004).

˘15˘

No. 1-05-4012

An "injurious environment" is an amorphous concept that cannot be defined with particularity; however, it has generally been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for her children. In re M.K., 271 Ill. App. 3d at 826; In re Edward T., 343 Ill. App. 3d at 794. The trial court's finding of neglect based on an injurious environment will not be reversed unless against the manifest weight of the evidence. In re M.K., 271 Ill. App. 3d at 826.

In the present case, the court's finding of neglect based on an injurious environment was not against the manifest weight of the evidence. The evidence established that respondent had a 19-year history of using cocaine, heroin, and marijuana, she used cocaine, heroin, and marijuana in the eighth month of her pregnancy, and she went on methadone to try to abstain from drug use. Sharena was born drug-exposed, and respondent was subsequently dropped from the methadone program because of positive urine drops. Respondent entered treatment at Gateway, but was inconsistent in her attendance. She passed a two-week detoxification program, but refused to enter inpatient treatment. She moved to southern Illinois, did not engage in any treatment there, then moved back to Chicago in April 2004, and admitted using drugs from April to December 2004. DCFS closed her case in March 2005, when it could no longer locate her, but then it received a hotline tip that respondent was using drugs. DCFS investigated and asked respondent to perform a urine drop, but she stated that she was too busy to comply. Sharena was then taken into protective custody by DCFS; the State filed its petition for adjudication of wardship four days later.

All of this evidence establishes that respondent's long-standing drug problems were not

under control for any sustained period of time between Sharena's birth in October 2002 and the filing of the petition in April 2005. The trial court found that respondent's drug problem and inability/refusal to complete treatment caused an injurious environment for Sharena; the court's finding was not against the manifest weight of the evidence.

Next, respondent contends that the trial court erred in basing its neglect findings, in part, on the fact that respondent was involved in an abusive relationship with Sharena's alleged father, Renard H. Specifically, in finding that respondent had exposed Sharena to an injurious environment, the court noted respondent's drug abuse and also that she was "in an abusive relationship that [she] had to run from."

Respondent claims that there were no facts supporting a finding that she was in an abusive relationship. To the contrary, respondent herself testified to the domestic violence inflicted upon her by Renard, specifically, that he grabbed her neck during a fight, while Sharena was present. Respondent also testified that in November 2004, Renard was beginning to "swing fists" against her. She testified that she went to Wisconsin in December 2004 because she was running away from Renard. Further, respondent testified that she obtained an order of protection against Renard in February 2005. Clearly, this evidence supports the trial court's finding that respondent was involved in an abusive relationship with Renard.

Respondent also contends that her due process rights were violated because the State's petition did not contain allegations of domestic violence. Respondent's argument is unavailing. The State's petition informed respondent that there was an allegation of neglect based on an injurious environment. The court merely considered the domestic violence as one of many

factors that created an injurious environment for Sharena. See In re A.D.R., 186 Ill. App. 3d 386, 391 (1989) (father's abuse of wife created an environment injurious to the child's welfare).

Respondent cites In re J.B., 312 Ill. App. 3d 1140 (2000). In J.B., the petition alleged neglect based on section 2-3(1)(b) of the Juvenile Court Act of 1987, which provides that a minor under the age of 18 is neglected if he is living in an environment injurious to his welfare. However, at the hearing, the State proceeded under section 2-3(1)(d), which provides that a minor under the age of 14 is neglected if left unsupervised for an unreasonable period of time without regard for his mental or physical health, safety, or welfare. The appellate court reversed the trial court's judgment because the State failed to put in the petition that it was proceeding under section 2-3(1)(d). In re J.B., 312 Ill. App. 3d at 1145.

In the present case, unlike in J.B., the State's petition alleged neglect based on an injurious environment, the State proceeded on a theory of neglect based on an injurious environment, and the court ultimately found neglect based on an injurious environment. Accordingly, there was no due process violation here.

Further, any error was harmless, where respondent's ongoing drug abuse and failure to complete treatment supports the trial court's finding of an injurious environment. Thus, the court's finding of neglect based on an injurious environment would have remained even in the absence of any evidence regarding the domestic violence inflicted on her by Renard.

Finally, respondent claims that the trial court erred in checking off the preprinted box on the adjudication order that states that Sharena's neglect "is the result of abuse or neglect inflicted by a parent." Respondent contends that since the court specifically found no abuse, that portion

of the adjudicatory order must be vacated.  This argument is without merit, as the adjudicatory order does not state that respondent abused Sharena.  Rather, the order states that Sharena's neglect is the result of "abuse or neglect."  (Emphasis added.)  The word "or" is a disjunctive particle used to express an alternative (see American Heritage College Dictionary 959 (2000)), and does not indicate that abuse was found.  Further, elsewhere in the adjudicatory order, the court correctly notes that the finding of neglect is based on an injurious environment and a drug-exposed infant.   The order correctly reflects the court's findings.

For the foregoing reasons, we affirm the circuit court.

Affirmed.

GALLAGHER, P.J., and FROSSARD, J., concur.