SIXTH DIVISION
April 6, 2007

No. 1-06-2661

| | | |
|---|---|---|
| IN THE INTERESTS OF: | ) | Appeal from the |
| | ) | Circuit Court of |
| GABRIEL E., JR., and JAMES M., | ) | Cook County. |
| | ) | |
| Minors/Respondents-Appellees | ) | |
| | ) | |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Nos. 06 JA 91 and 06 JA 92 |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARGARET C., | ) | The Honorable |
| | ) | Rena Marie Van Tine, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Following adjudicatory and dispositional hearings, minors/respondents-appellees Gabriel E., Jr. and James M. (G.E. and J.M.) were found to be neglected due to an injurious environment and were declared wards of the court. G.E. and J.M.'s mother, respondent-appellant Margaret C. (appellant), appeals from the orders entered in the cause, contending that the trial court erred in finding the boys neglected. She asks that we reverse the trial court's holding and direct that the petitions for adjudication of wardship be dismissed. For the following reasons, we affirm.

## BACKGROUND

J.M. was born to appellant and Jose M.[1] on March 11, 1993; G.E. was born to appellant

---

[1]Jose M., J.M.'s biological father, is a non-custodial parent; he has taken no part in this appeal.

and Gabriel E., Sr. (Gabriel)[2] on October 29, 2004. Both boys lived with appellant and Gabriel.

On February 3, 2006, petitioner-appellee The People of the State of Illinois (State) filed petitions for adjudication of wardship for G.E. and J.M. pursuant to section 2-3(1)(b) of the Juvenile Court Act (Act) (705 ILCS 405/2-3(1)(b) (West 2004)), stating that the boys were neglected due to an injurious environment. The petitions cited supporting facts including a prior report of injurious environment, statements from J.M. that Gabriel was hitting him, G.E. and appellant, and Gabriel's continued living in the family home after appellant was instructed by police and the Illinois Department of Children and Family Services (DCFS) to keep him away from the boys.

An adjudicatory hearing was held on June 6, 2006. Gloria Crosby, a DCFS investigator assigned to the case, testified that DCFS received a hotline call on June 18, 2005 that Gabriel had a knife to G.E.'s throat and was threatening to throw the boy in a garbage can. Crosby interviewed appellant the next day and when Crosby asked her if she and Gabriel had fought, appellant stated that she had only a "little argument" with him and a neighbor had called DCFS. Crosby then asked appellant if Gabriel was still living in the home, and appellant told her he no longer was as of the prior evening. Crosby testified, however, that she then looked in the family home and saw a man's shoes and jewelry, which appellant explained belonged to her brother who sometimes spent the night there. Crosby noted in a written report that while she was visiting the home, someone knocked on the door; appellant did not answer, telling Crosby that it was probably just her landlord. When the knocking occurred again, appellant went to the door,

---

[2]Gabriel, G.E.'s biological father, has taken no part in this appeal.

whispered something to the person outside, and returned her attention to Crosby. Appellant told Crosby that police had advised her after the knife incident to take G.E. to the doctor and not to let Gabriel back in the home; Crosby repeated the same to appellant, who agreed that she would follow these recommendations. Crosby noted in her report that she did not believe appellant's story about the visitor during their conversation being her landlord, for when Crosby left appellant's apartment, she saw a man fitting Gabriel's race and age walking around the complex.

Crosby testified that on June 22, 2005, appellant called and told her she had taken G.E. to the doctor, who had diagnosed him with asthma and provided him with medication. Crosby asked appellant if she knew where Gabriel was or how he could be reached, and appellant told her she did not. Crosby then asked appellant if she had any contact information for him, and appellant stated that Gabriel did not have many minutes on his cell phone. Crosby testified that she found this suspicious, as appellant first stated she did not know where Gabriel was but then stated she knew how to contact him. Crosby testified that about 20 minutes after her conversation with appellant, she received a phone call from a man who identified himself as Gabriel. The man told Crosby that his sister had been the one who called police on June 18, 2005, that appellant had been at his sister's home, that his sister did not allow her to return there, and that he had been forced to leave with G.E. The man refused to give his information to Crosby or to meet with her.

Crosby further testified that between June 22, 2005 and July 29, 2005, she attempted several times to talk to and/or meet with appellant to make a safety plan for G.E. and J.M., but appellant would never return her calls or answer her door. Crosby sent appellant a certified letter

demanding that appellant contact her. On July 29, 2005, Crosby finally met with appellant and confronted her with information she obtained during her investigation from outside sources, including that it had been appellant and not a neighbor who had called the DCFS hotline regarding Gabriel, that Gabriel had been arrested, and that Gabriel was continuing to live in the home with appellant and the boys. Crosby stated that appellant did not deny any of this but, rather, became defensive and angry at the accusations made against Gabriel. Therefore, Crosby indicated a report for DCFS citing an injurious environment based on appellant's continued placement of the boys at risk by her noncompliance with the safety plan and her noncompliance with being forthcoming about information regarding Gabriel's whereabouts.

On cross-examination, Crosby testified that she never saw Gabriel in the home, there was no evidence of him living there as of July 29, 2005, and upon her examination, G.E. appeared to be healthy and well cared for.

Juliann Chitwood, appellant's mother and G.E. and J.M.'s maternal grandmother, testified at this hearing regarding several incidents. She stated that she, the boys and one of Gabriel's sisters were present one day while appellant and Gabriel were moving together from one apartment to another. Chitwood witnessed an argument arise between appellant and Gabriel about a stove; Gabriel raised his fists twice, but did not strike, appellant, whereupon Chitwood intervened. Chitwood further testified that she babysat for J.M. for five or six days in December 2005, while appellant went to California to meet Gabriel, who had just been released from prison there, and to bring him back home to their apartment in Chicago with the boys. When Chitwood advised appellant not to go, appellant told her it was none of her business. Chitwood further

testified that in January 2006, while J.M. was again with Chitwood, he told her he was afraid to go home; when Chitwood inquired as to why, J.M. told her he was afraid all the time that Gabriel was going to do something to him.

Denice Plump, another DCFS investigator assigned to the case following statements J.M. made to a teacher, also testified. She averred that on January 25, 2006, she met with J.M. at his school and J.M. told her that he, G.E. and appellant were being repeatedly hit by Gabriel, who was living with them in their apartment. He told Plump that he had stayed home from school a few days prior because Gabriel had hit him in the head and face, and that he was afraid of him. Plump then met with appellant that same day at J.M.'s school and told her about J.M.'s statements and her concern that Gabriel was living at the home and hurting the boys. Plump testified that she and appellant agreed that appellant and the boys should temporarily live with Chitwood until a new plan could be implemented to remove Gabriel from the family home. With appellant's full cooperation, Plump suggested that appellant, who had brought G.E. to the meeting, immediately follow Plump in her (appellant's) own car to Chitwood's home four blocks away. Plump testified that as she began driving, appellant turned off and went in a different direction. Plump proceeded to Chitwood's home and waited for appellant and G.E., but appellant never showed up and did not answer her cell phone. While Plump was waiting, she received a call from a man who identified himself as Gabriel; he refused to give his location or address and stated only that Plump was not going to take G.E. away from him.

Plump further testified that appellant did not meet with her again until five days later, on January 30, 2006, at Chitwood's home. Appellant denied that any domestic violence between her

5

and Gabriel had ever occurred, that Gabriel had ever hit G.E. or J.M., and that Gabriel was living in the home. Plump stated that as the conversation progressed, however, appellant admitted that Gabriel moved out only five days earlier. Plump also questioned appellant regarding her trip to California; appellant initially denied it, but then admitted to Plump that she had taken a bus there to pick Gabriel up from prison and bring him back to Chicago. During this meeting, appellant received a cell phone call; she told the caller she would be home in a few minutes. When Plump asked appellant who was on the phone, appellant refused to identify the caller or show Plump the caller identification on the phone. Plump testified that, based on what she believed to be credible information that Gabriel was living at the home with appellant and the boys and being violent towards them, as well as on appellant's continued uncooperativeness and failure to correct the situation, she indicated the case to DCFS.

Following the uncontested admission of the DCFS reports into evidence, appellant rested her case without presenting any witnesses or evidence. At the conclusion of the adjudicatory hearing, the trial court entered a finding that G.E. and J.M. were neglected, as being in an injurious environment. The court stated at the outset of its ruling that it found that "all of the witnesses who testified were highly credible witnesses, and their testimony was unrebutted." It specifically noted that J.M.'s statements were "corroborated by the evidence." This included "[p]articularly the evidence from" Chitwood who actually saw Gabriel assault appellant in front of the boys during the incident when they were moving. The court then stated that "[a]lso, [appellant's] actions in the case further corroborated" J.M.'s statements "in that she was not cooperative with the investigation" as exhibited by her evasive actions, her failure to follow

6

Plump to Chitwood's home after agreeing to do so only minutes before, and her refusal to disclose the identification of the caller during her conversation with Plump to whom she told she would be home soon. The court concluded that, based on all this, the State had met its burden of proof in showing that G.E. and J.M. "were in this dangerous environment fraught with domestic violence, and that the conduct *** violates the neglect, injurious environment" section of the Act. The court further concluded that both Gabriel and appellant propounded this neglect: Gabriel for inflicting the violence and appellant "for her failure to protect her children, and for her evasive actions in covering up the domestic violence."

A dispositional hearing was then held on August 16, 2006. At the outset of the hearing, appellant agreed that a finding should be entered declaring her unable[3] to care for G.E. and J.M. and that they should be placed in the guardianship of DCFS. During the hearing, Carlos Payne, a Catholic Charities caseworker assigned to appellant's case, testified that appellant had been assessed in March 2006 as needing domestic violence counseling, parenting classes, psychological evaluation and individual therapy. While appellant had been "making progress," she still did not believe J.M. was telling the truth about what occurred, she still needed to complete parenting classes and, in May 2006, she tested positive for marijuana, which required her to attend additional classes. Payne further testified that during his supervision of appellant's visits with the boys, he observed that although appellant was good with G.E., there really was not "a good interaction" with J.M. Payne also stated that J.M.'s individual therapist reported to him

---

[3]The parties agreed to, and the trial court entered, a finding of "unable" only with respect to appellant, rather than a finding of unable, unwilling and/or unfit to care for the boys.

7

that J.M. was having recurrent nightmares of Gabriel hitting him and being physically and verbally abusive.

At the conclusion of the dispositional hearing, and as per appellant's concession, the court adjudged G.E. and J.M. wards of the court. While appellant had been cooperative with the programs and visited her children, the court noted that she still need to complete various services before reunification could occur. The court, therefore, found that appellant was "unable for some reason other than financial circumstances alone to care for, protect, train, and discipline" the boys and placed them in DCFS guardianship.

ANALYSIS

Appellant appeals both the adjudicatory and dispositional orders entered by the trial court, contending that it erred in finding G.E. and J.M. were neglected due to an injurious environment. Citing section 2-18(4)(c) of the Act and relying primarily on In re A.P., 179 Ill. 2d 184 (1997), appellant asserts that there was no corroboration for J.M.'s statements to properly sustain the findings and, thus, the court had no viable legal reason for entering its orders. Appellant points to a record "devoid of any evidence of some physical manifestation" of abuse by Gabriel to J.M., G.E. or appellant, "devoid of anyone other than" J.M. making such a statement, and a lack of independent evidence to support any inference that Gabriel inflicted such abuse, *i.e.*, that the court's reliance on Chitwood's testimony and appellant's actions did not support its holdings. We disagree.

"Neglect" is the failure to exercise the care that circumstances justly demand, and encompasses both willful and unintentional disregard of parental duty. See In re Sharena H., 366

Ill. App. 3d 405, 415 (2006); accord In re Kamesha J., 364 Ill. App. 3d 785, 792-93 (2006).

Pursuant to section 2-3(1)(b) of the Act, a "neglected minor" includes any child under age 18

whose environment is injurious to his welfare. See Kamesha J., 364 Ill. App. 3d at 792; In re

T.S-P., 362 Ill. App. 3d 243, 248 (2005) (a child can be found neglected if his environment is

injurious to his welfare). An "injurious environment" is "an amorphous concept that cannot be

defined with particularity, but has been interpreted to include the breach of a parent's duty to

ensure a safe and nurturing shelter" for her children. Kamesha J., 364 Ill. App. 3d at 793; accord

Sharena H., 366 Ill. App. 3d at 416; T.S-P., 362 Ill. App. 3d at 248. This is because our courts

have consistently recognized that a parent has a duty to keep her children free from harm. See

Kamesha J., 364 Ill. App. 3d at 793.

The terms "neglect" and "injurious environment" do not have fixed and measured

meanings but, rather, take their content from the particular circumstances of each case. See

Sharena H., 366 Ill. App. 3d at 415; Kamesha J., 364 Ill. App. 3d at 793; T.S-P., 362 Ill. App. 3d

at 248. Therefore, cases involving such allegations are *sui generis* and must be decided on the

basis of their unique facts. See Kamesha J., 364 Ill. App. 3d at 793. The State has the burden of

proving the allegations by a preponderance of the evidence. See Sharena H., 366 Ill. App. 3d at

415; accord Kamesha J., 364 Ill. App. 3d at 793; T.S-P., 362 Ill. App. 3d at 248. On review, a

trial court's finding of neglect due to an injurious environment will not be reversed unless it is

against the manifest weight of the evidence. See Sharena H., 366 Ill. App. 3d at 415-16

(reviewing court is to give deference to trial court's findings of fact, as trial court is in best

position to observe conduct and demeanor of parties and witnesses, assess credibility and weigh

evidence presented at adjudicatory and dispositional hearings); accord Kamesha J., 364 Ill. App. 3d at 793.

In the instant case, the trial court's finding of neglect based on an injurious environment was not against the manifest weight of the evidence.

Appellant is correct that section 2-18(4)(c), which governs the use of a minor's hearsay statement in an adjudicatory hearing to determine abuse or neglect, states:

> "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 20004).

Yet, appellant's substantive assertions on appeal mischaracterize the evidence in the instant record. More specifically, her reliance on A.P. and its discussion of section 2-18(4)(c) do nothing to support her argument.

First, A.P., which does not involve neglect or injurious environment, is distinguishable from the instant case. There, the State petitioned for adjudication of wardship alleging that a minor's father had sexually abused her. The trial court adjudicated the minor a ward of the court and the father appealed; the case was affirmed and the father sought review with our state supreme court alleging in part, much as appellant here, that the evidence was insufficient to support the finding of abuse because it consisted solely of the minor's uncorroborated hearsay statements, in violation of section 2-18(4)(c) of the Act. See A.P., 179 Ill. 2d at 193-94. The father's specific argument focused on whether there must be corroboration of both the occurrence

of abuse and the identity of the abuser in order for the minor's statements to be admissible. After analyzing section 2-18(4)(c), the A.P. court held that only corroboration of the abuse is required, as this balances the interests of those accused of abuse and the welfare interests of the minor. See A.P., 179 Ill. 2d at 197-98 (this preserves the effect of section 2-18(4)(c)'s exception to the general rule against hearsay in the context of abuse and neglect cases, while still requiring some corroboration when the minor is unable or unwilling to testify and be subjected to the tests of cross-examination). Ultimately, upon examining the particular facts of the case before it, the A.P. court found that there was sufficient evidence of sexual abuse to corroborate the minor's statements under section 2-18(4)(c). See A.P., 179 Ill. 2d at 198-200 (discussing what is sufficient corroboration, which we will outline more fully below).

We find absolutely no problem with the holding of A.P. or its reasoning. What we object to is appellant's insistence that A.P. is on point with the instant case. That would perhaps be true if the instant situation involved abuse. Yet, what appellant miscomprehends is the very basis of her cause. That is, the petitions for adjudication of wardship for G.E. and J.M. were based on neglect due to an injurious environment, not, as in A.P., on abuse. Accordingly, and contrary to appellant's contention and to A.P., the question here is not whether there was corroboration for J.M.'s statements of abuse in order to prove that abuse occurred. It is, instead, whether the State demonstrated by a preponderance of the evidence that, based on the circumstances presented at the hearings, G.E. and J.M. were neglected due to an injurious environment.

Let us turn for a moment to J.M.'s statements at issue. According to appellant, J.M.'s statements to Plump that Gabriel, whom he feared, was continuing to live in the family home

(following the police and Crosby's recommendations that he not be allowed to do so), that Gabriel had repeatedly beat him, G.E. and appellant, and that J.M. stayed home from school one day because Gabriel had hit him on the head and face, were "uncorroborated" and, thus, were not a proper basis for the court's finding of neglect. However, these statements were not presented or considered for what they intimated, *i.e.*, that Gabriel was abusing G.E. and J.M. Again, the State proceeded for wardship of these minors based on neglect, not abuse. Therefore, unlike in A.P. where the minor's statements of abuse required corroboration because the State was seeking wardship based on this abuse, such is not the case here.

Moreover, any consideration of A.P. and its analysis of section 2-18(4)(c) more clearly supports a position contrary to appellant's rather than supportive of it. As our supreme court in A.P. explained, section 2-18(4)(c) provides an exception to the hearsay rules by allowing the admission of a minor's out-of-court statements of abuse or neglect at an adjudicatory hearing as long as the statements have sufficient corroboration. See A.P., 179 Ill. 2d at 198. Such corroboration includes any independent evidence which would support "a logical and reasonable inference" that the act described by the minor occurred, *i.e.*, any evidence, "*physical or circumstantial*," that makes it more probable than not that the minor was abused or neglected. A.P., 179 Ill. 2d at 199 (emphasis added). Ultimately, whether sufficient corroboration exists is determined on a case-by-case basis. See A.P., 179 Ill. 2d at 199.

Appellant is wholly incorrect in asserting that it was solely J.M.'s statements that formed the basis of the petitions for wardship or the trial court's decision to adjudicate G.E. and J.M. neglected. The record is clear, as specifically evidenced by the testimony and the trial court's

12

colloquy at the adjudicatory hearing, that there was an abundance of evidence presented, in addition to and independently corroborative of J.M.'s statements, which provided a sufficient basis for the findings of neglect based on injurious environment.

The testimony presented at the hearing demonstrated appellant's consistent noncompliance with DCFS and her refusal to remedy the home-life situation of G.E. and J.M. DCFS investigator Crosby testified that after receiving the hotline call, appellant admitted she had argued with Gabriel. Appellant then assured Crosby that Gabriel was no longer living in the family home, yet Crosby discovered a man's shoes and jewelry there. While appellant was talking to Crosby, someone began knocking on the door; after dismissing it, appellant then answered the door in a whisper. Following her departure, Crosby saw a man matching Gabriel's race and age standing outside in the apartment complex. Crosby further testified that a few days after this meeting, appellant told her she did not have any contact with Gabriel, yet then admitted that she knew his cell phone number and the fact that he did not have many minutes left on the phone; this statement was followed by a phone call from Gabriel to Crosby only 20 minutes later. For the next month, Crosby attempted several times to contact appellant to implement a safety plan for the boys; each time, appellant would not answer her door or return phone calls. It was not until Crosby sent a certified letter that appellant finally met with her, whereupon appellant became defensive and angry when Crosby confronted her with the information from her investigation which indicated that Gabriel hit the boys and was still living in the family home.

Chitwood, the boys' grandmother, testified to three main incidents. First, she stated that, during an argument between Gabriel and appellant while she, the boys and Gabriel's sister were

all present, she saw Gabriel ball up his fists and raise them twice toward appellant during an argument. Next, she testified about when appellant asked her to babysit J.M. for six days in December 2005, months after her involvement with DCFS and the implementation of the safety plan to keep Gabriel out of the family home, while appellant went to California. Chitwood described that appellant told her she was going there to pick up Gabriel from his prison release and bring him back to their Chicago apartment and to the boys. Finally, Chitwood testified that a month later, J.M. told her that he was afraid to go home because Gabriel was there and he was scared that Gabriel would do something to him.

DCFS investigator Plump also provided corroborating testimony regarding appellant's maintenance of an injurious environment for the boys. Plump testified that on the day she met with appellant at J.M.'s school regarding the statements he had made about Gabriel, appellant agreed that she and the boys should live with Chitwood until Gabriel could be removed from the family home, and she agreed that she, with G.E. in tow, would immediately follow Plump to Chitwood's home four blocks away. Yet, as Plump began driving, appellant veered off in another direction with G.E. and never appeared at Chitwood's home that day, nor did she answer her cell phone as Plump continued to try and contact her. Later that day, Plump received a call from Gabriel stating that no one was going to take G.E. away from him. Plump further testified that, following that incident, appellant did not make herself available for the next five days, whereupon she then denied any domestic violence, any violence toward the boys, and that Gabriel had been living in the family home. Plump stated that as the conversation progressed, however, appellant admitted that Gabriel was living in the home up until a few days ago, and that

she had gone to California to bring him back to Chicago to live with her and the boys. During this meeting, appellant received a cell phone call and told the caller she would be home soon, but then refused to tell Plump who it was or show her caller identification.

At the close of the adjudicatory hearing, the trial court summed up the evidence in this case and concluded that it sufficiently corroborated J.M.'s statements regarding the boys' injurious environment. Having seen Crosby, Chitwood and Plump testify, the court found them to be credible witnesses and noted that appellant provided no evidence to rebut their testimony. Then, in discussing the basis of its decision, the court cited not only to the two indicated DCFS reports written by Crosby and Plump and entered into evidence without objection, but also to Chitwood's testimony of having witnessed Gabriel's assault of appellant in front of the boys and to appellant's "actions" demonstrating her uncooperativeness, including her consistent evasiveness, driving away from Plump after only minutes before agreeing to remove the boys from the family home as per the DCFS safety plan, and her refusal to disclose the identification of the caller during her meeting with Plump.

Appellant's assertions on appeal provide us with no valid reason to reverse the trial court's decision. That the record is "devoid of any evidence of some physical manifestation" of abuse is irrelevant and does not render J.M.'s statements uncorroborated. As our supreme court noted in A.P., any independent evidence, physical or circumstantial, that supports a logical and reasonable inference that the act described by the minor occurred is sufficient to corroborate the minor's statements and may be examined in a determination regarding neglect. See A.P., 179 Ill. 2d at 199 ("[t]he form of corroboration will vary depending on the facts of each case and can included

physical or circumstantial evidence").  Moreover, appellant is plainly wrong in stating that the record is "devoid of anyone" other than J.M. making similar statements regarding Gabriel and his treatment of the family.  The trial court found Chitwood's testimony particularly credible as she described Gabriel's assault of appellant in front of others, particularly the boys.  Also, both Chitwood and Plump testified that appellant, months after DCFS had implemented the safety plan and instructed her to keep Gabriel away from the boys, told them she went to California to pick up Gabriel and bring him back to live in the family home in Chicago.  Finally, appellant's comments that her failure to cooperate with DCFS "in no way supports a logical inference that" Gabriel hit her, G.E. or J.M., only further demonstrates her confusion here.  Whether her failure to cooperate was a sufficient basis to find that Gabriel hit J.M. or the family is not the issue; again, this cause proceeded on a basis of neglect due to injurious environment, not abuse.

It is clear to us that the trial court's finding of neglect was not against the manifest weight of the evidence.  The record undeniably demonstrates that appellant continually evaded DCFS and failed to cooperate with its recommendations by allowing Gabriel to live in the family home with G.E. and J.M.  As the trial court found, appellant was given several chances to work with DCFS and keep Gabriel away from the boys.  Though she at first seemingly agreed to do so, each time she went back on this in favor of being with Gabriel.  The unrebutted evidence presented at the adjudicatory hearing supports the conclusion that appellant failed to exercise the necessary care and, instead, willfully disregarded her parental duty to keep the boys free from harm, thereby creating an injurious environment and rendering G.E. and J.M. neglected minors.  Accordingly, we find no reason to reverse the trial court's decision here.

Regarding one final matter, we note that appellant concedes in her brief on appeal that if we affirm the trial court's finding of neglect due to injurious environment, then the dispositional order entered in the cause declaring G.E. and J.M. wards of the court and finding her unable to care for them for some reason other than financial circumstances should also be affirmed. We, along with the State and the minors' guardian on appeal, find no dispute with this. Pursuant to section 2-27(1) of the Act, a trial court may commit a minor to wardship upon a determination that the parent is unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor and that the health, safety, and best interests of the minor will be jeopardized if the minor remains in the custody of the parent. See 705 ILCS 405/2-27(1) (West 2004); Kamesha J., 364 Ill. App. 3d at 795. The trial court's determination regarding this will be reversed only if the factual findings at the dispositional hearing are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. See Kamesha J., 364 Ill. App. 3d at 795.

At the outset of the dispositional hearing in the instant case, appellant addressed the trial court and asked that a finding be entered declaring her unable to care for G.E. and J.M. and placing them under DCFS wardship. Thus, there is no argument on this point, and the dispositional order is affirmed.

In an effort to preserve a complete record on appeal, we additionally note that all the evidence presented at the dispositional hearing supports the trial court's finding that appellant was unable to protect and care for G.E. and J.M. Caseworker Payne testified that while appellant had been making some progress in completing her assessments and had been visiting the boys,

she had not finished all of her parenting classes. Significantly, Payne stated that appellant told her therapist that she still did not believe J.M. was telling the truth about the family's situation, and that appellant had just recently tested positive for marijuana. Also, Payne noted during the hearing that appellant was not interacting well with J.M. at this point, and that J.M. was having recurrent nightmares about Gabriel. Based on this evidence, we find that the trial court's dispositional order declaring appellant unable, for some reason other than her financial circumstances, to care for or protect G.E. and J.M. was not against the manifest weight of the evidence. See Kamesha J., 364 Ill. App. 3d at 796 (although mother participated in some recommended services, this did not mean that dispositional order other than court's order declaring minors wards of court was in best interests of minors; to the contrary, mother had not completed all services suggested at assessment including parenting classes and counseling and, thus, order was not against manifest weight of the evidence).

CONCLUSION

Accordingly, for all the foregoing reasons, we affirm both the trial court's adjudicatory order finding that G.E. and J.M. were neglected due to an injurious environment and the trial court's dispositional order finding appellant unable to care for G.E. and J.M.

Affirmed.

McNULTY and O'MALLEY, JJ., concur.