2022 IL App (1st) 22-0701-U

No. 1-22-0701

Second Division
October 14, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| *In re* M.O., | ) | Appeal from the Circuit Court of Cook County. |
| Minor, | ) | |
| (The People of the State of Illinois, | ) | No. 18 JA 1218 |
| Petitioner-Appellee, | ) | |
| v. | ) | |
| T.O., | ) | Honorable Shannon O'Malley, Judge, presiding. |
| Respondent-Appellant). | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's findings of abuse and neglect were not against the manifest weight of the evidence, and the trial court did not abuse its discretion in denying respondent's motion *in limine* where the evidence sought to be admitted was not relevant to the proceedings.

¶ 2    Respondent, T.O., is the biological mother of the named minor, M.O. Following adjudication and dispositional hearings, the trial court found M.O. to be abused and neglected pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2018)), adjudicated him to be a ward of the court, and placed him in the guardianship of the Department of Children and Family Services (DCFS). On appeal, respondent seeks to have the adjudication and disposition orders vacated, arguing that (1) the findings of abuse and neglect, as opposed to no-fault dependency, were against the manifest weight of the evidence and (2) the trial court erred in excluding evidence arising after the filing of the petition for adjudication of wardship. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    Respondent is the mother of M.O., born October 19, 2006. M.O. was 12 years old at the time these proceedings were initiated. Respondent has five other minor children who were not involved in this case. The biological father was unknown despite efforts to establish paternity.

¶ 5    On December 28, 2018, the State filed a petition for adjudication of wardship for M.O., alleging that he was neglected due to a lack of necessary care (705 ILCS 405/2-3(1)(a) (West 2018)) and an injurious environment (*id.* § 2-3(1)(b)) and abused based on a substantial risk of physical injury other than accidental means (*id.* § 2-3(2)(ii)) and excessive corporal punishment (*id.* § 2-3(2)(v)). The State alleged the following facts in support of its petition:

        "Mother has one indicated report for cuts, welts and bruises for striking this minor.

    Minor has a diagnosis of ADHD and mood disorder. Mother has a history of failing to

    obtain necessary mental health services including counseling and psychotropic medication.

    Minor has exhibited dangerous behaviors in the home. On or about December 22, 2018

    mother repeatedly struck minor about the face. Minor presented with bruises and abrasions

consistent with being struck. Mother admits to striking minor with a belt and has previously admitted to hitting minor with a plastic bat. Mother has failed to cooperate with requested mental health assessments. Putative father's identity is unknown. Paternity has not been established."

¶ 6 Respondent was present, and the trial court appointed a guardian *ad litem* (GAL) for M.O. and counsel for respondent. That day, the court granted temporary custody of M.O to the DCFS.

¶ 7 On June 5, 2019, the State amended the petition, adding an allegation of physical abuse (705 ILCS 405/2-3(2)(i) (West 2018)).

¶ 8 On April 30, 2021, respondent filed an affirmative defense, asserting that, pursuant to section 2-4 of the Act (705 ILC 405/2-4(1)(c) (West 2018)), M.O. is neither abused nor neglected but rather he is dependent by no fault of respondent. Respondent referred to M.O.'s extensive psychiatric history and resistance to mental health treatment in support of her defense.

¶ 9 On December 7, 2021, respondent filed a motion *in limine*, requesting the admission of certain evidence at the adjudication hearing. The motion sought to admit evidence of incidents occurring at O'Keefe Elementary School in 2017, disruptions during foster care in 2019, M.O.'s current enrollment in an alternative high school, his continuing need for psychotherapeutic services, and his Indiana sentence of probation for public disturbance and resisting arrest from August 2021. She argued that this evidence was relevant and probative of her affirmative defense of no-fault dependency.

¶ 10 After hearing arguments on the motion, the court allowed respondent to present evidence of the incidents occurring in 2017 but denied the other requests, reasoning that the recent evidence related to M.O. as a 15-year-old, "hormones have kicked in," and "[t]hings are different now." As such, the court found that the evidence did not "relate back" to when temporary custody occurred.

¶ 11    The adjudication hearing was held on December 8 and 9, 2021. The following evidence was presented.

¶ 12    A number of exhibits were first admitted into evidence. We summarize their contents as is necessary to the resolution of this appeal.

¶ 13    The State admitted Hartgrove Hospital's records for M.O. These records showed that M.O. began treatment at Hartgrove on October 19, 2015, where he received inpatient treatment after reporting suicidal ideation. M.O. reported that he had recently moved back in with respondent after living with his grandmother for several years. He also reported a history of mistreatment from respondent and DCFS had been involved because respondent was aggressive towards him. Hartgrove listed M.O.'s diagnoses as ADHD and unspecified mood disorder. According to the records, on November 9, 2015, respondent stated that respondent would not get his medication. On November 18, 2015, M.O. became more irritable and said that he had not taken his medicine because his mother had not brought it to him.

¶ 14    After again reporting suicidal thoughts, M.O. was admitted for inpatient psychiatric hospitalization on January 18, 2017. He later stated that he had lied about wanting to hurt himself because he wanted to get away from respondent. He reported not feeling safe in respondent's house, that she threatened to "whoop" the children, and there was yelling and fighting in the home. He informed staff that respondent punched, slapped, and pushed him. He had stopped taking his medication because respondent did not give it to him, and he was experiencing suicidal ideation. While there, he was prescribed Ritalin to treat his ADHD. After being stabilized, M.O. was discharged on February 10, 2017, to his maternal aunt, Tia, pursuant to a safety plan.

¶ 15    The State also submitted M.O.'s records from Kaleidoscope. On February 9, 2017, intact family services were instituted for respondent and M.O. through Kaleidoscope. DCFS refers

families to this program to reduce risk and safety concerns that could result in children being removed from the parents' custody. These records included extensive caseworker notes for 2017 and 2018.

¶ 16 The notes indicated that in April 2017, M.O. became angry at school. He cursed, yelled, and threw desks. He was sent to Comer Children's Hospital before being admitted to Garfield Park Behavioral Health Hospital. M.O. later admitted to purposefully getting angry in order to get out of detention. He indicated that he wanted to be discharged back to Tia's house. He was discharged on April 26, 2017.

¶ 17 The Kaleidoscope records contained the DCFS investigation summaries for the D, E, and F sequence reports. The D sequence report summary stated that on October 11, 2017, M.O. went to school with a 2.5 inch scratch on his cheek, which he stated was the result of respondent hitting him with a stick. He had been absent from school the previous day due to this injury. The summary further stated that respondent had not followed up with M.O.'s mental health needs and she was uncooperative with the investigation. Respondent denied hitting M.O. and stated that he fell. The investigation found that the allegation that respondent inflicted 11 cuts, bruises, welts, abrasions, and oral injuries was indicated.

¶ 18 The E and F sequence reports were companion investigations that stemmed from the same incident in January 2018. The summary stated that a home visit occurred and the father of the other minor children reported that respondent and M.O. had been involved in a physical altercation. According to this report, M.O. took respondent's phone and respondent took a plastic baseball bat and hit M.O. on the lower half of his body. After being separated, respondent continued to attempt to "get at" M.O. and M.O. had a knife and tried to stab respondent. No marks or injuries were observed. M.O. reported that he was afraid to go home. The summary continued stating that M.O.

had a diagnosis of ADHD but was not compliant with taking his medication. There were also allegations that respondent had been diagnosed with bipolar disorder and was not taking medication. The testimony indicated that this report was determined to be unfounded.

¶ 19    Also entered into evidence were the Chatham Family Counseling Center records from 2017 and 2018. The records showed that respondent had three intake appointments scheduled but she did not attend any of them. The records for M.O. showed that he was prescribed Prozac, an antidepressant, at one point, but it was discontinued at the request of the grandfather. Otherwise, M.O. was prescribed Ritalin and clonidine for his ADHD. Further, there was documentation showing that he attended some sessions for individual therapy but he did not appear for more than 20 appointments between 2017 and 2018. Chatham sent notices to respondent regarding the missed appointments. Eventually, he was discharged from treatment due to absenteeism. Respondent was informed that he had been discharged.

¶ 20    Trinity Hospital records from 2018 were also presented. These included an emergency department clinical summary dated December 24, 2018. M.O. was evaluated at the request of DCFS and the records indicated that M.O. had a facial abrasion, facial laceration, and lip abrasion. The notes stated that these injuries were considered a "non-accidental injury to child" and "physical child abuse." M.O. reported to the provider that he and his mother argued after he came home late and she punched, slapped, and scratched him on the face. He also reported that similar episodes had occurred in the past.

¶ 21    The records from O'Keefe Elementary School showed an extensive log from 2017 of behavioral issues, including cursing at and threatening students and staff and threatening to kill himself. The records included a specialized 504 plan to provide accommodations for M.O.'s ADHD, as well as asthma. The plan indicated that M.O. was also admitted to Streamwood

Behavioral Hospital on May 1, 2017 and discharged May 16, 2017, and he was diagnosed there with disruptive mood dysregulation disorder, post traumatic stress disorder, and ADHD. The plan indicated that M.O. was prescribed clonidine for his ADHD, which he was to take at noon each day.

¶ 22    Finally, the State admitted three photographs of M.O.'s injuries taken on December 23, 2018 by Richmond.

¶ 23    The following testimony was then presented.

¶ 24    Respondent testified that M.O. is one of her six children and he resided at her home at the time that DCFS initiated this case. When asked about the assigned intact services, she responded that she did not know what intact services were and did not remember what services she participated in but that she did whatever DCFS asked her to do. When asked if M.O. had been diagnosed with a mental illness, she answered that he had been "inpatient multiple times." She testified that she did not know what M.O.'s diagnosis was and she did not know what medication he was prescribed. She also testified that she had never been diagnosed with bipolar disorder, but she had taken medication at some point for a mental illness but she did not know what the medication was called. She did not recall when she last took medication for this mental illness. She testified that she did not remember where M.O. was living between January 2017 and December 2018 because he was moving around to different family members' homes. She also testified that M.O. "lashed out" at his family members when he lived with them.

¶ 25    When asked about the October 2017 incident where it was reported that she had hit M.O. with a stick, she testified that she did not remember that but later stated that the report was unfounded. In regards to the February 2018 incident involving the bat, she testified that she did

not remember that incident and that it would be "petty" to hit someone with a plastic bat over a cell phone.

¶ 26    In regards to the December 2018 incident, respondent stated that she had allowed M.O. to go roller skating with his friends, including his cousin, but she believed that he was going to be dropped off and picked up by one of his friend's parents. She found out that he had walked to the roller rink and, around 11 p.m., she heard that something had occurred with M.O. and his cousin. She went to the family member's house where M.O. was located, where she and M.O. had an argument. She testified that when she first saw M.O., his face was "just real swollen period and scratches." She was worried because she learned that M.O. was in a fight with individuals who had guns and M.O. had not answered her phone calls to his cell phone or informed her that he was not getting a ride home. She later saw on his cell phone that he had called other people. After taking away his phone, he "stomped and pouted like he usually used to do." She stated that M.O. spit in her face during the argument. She testified that she hit M.O. one time with a belt below the waist, although she could not remember where she found the belt. She denied being angry with M.O. She denied hitting, slapping, kicking, or punching M.O. when they were back at her house.

¶ 27    Respondent additionally testified that she did not consent to any safety plan and that DCFS placed M.O. with family members without her consent. She also testified that DCFS informed her that the family members would give M.O. his medication and take him to school and counseling appointments. She believed Kaleidoscope was not giving M.O. the services he needed. After transferring from Kaleidoscope to One Hope United, respondent participated in parenting coaching, which she completed. She affirmed that she took M.O. to a number of counseling appointments at Chatham on specific dates but that she did not know why Chatham ultimately discharged him.

¶ 28    Dr. Ross Kalman, who was qualified as an expert in emergency room medicine and having expertise in the diagnosis of abuse and neglect, testified that he was the attending emergency room physician at Trinity Hospital on December 23, 2018. Dr. Kalman examined 12-year-old M.O., who came to the emergency room with his grandmother. Dr. Kalman interviewed the grandmother separately and she reported that respondent punched and slapped M.O., although it was unclear whether the grandmother observed the incident or had only been informed about it from another person. She also informed Dr. Kalman that M.O. had missed several doctor's appointments and may not be up to date on his immunizations.

¶ 29    Dr. Kalman interviewed and examined M.O.  M.O. had two lacerations on the left side of his face and an abrasion to his lip. M.O. informed Dr. Kalman that he and respondent argued after he had stayed out late and she punched, slapped, and scratched him.

¶ 30    To a reasonable degree of medical certainty, Dr. Kalman diagnosed child abuse based on "the pattern of those injuries that correlated with the history that [M.O.] provided [to him] at the time at the emergency room." He opined that the lacerations and abrasions could have been caused from slaps and punches to the face, as M.O. reported and that these injuries were nonaccidental. He further testified that these injuries had occurred recently, within the previous day or two. M.O. also reported to Dr. Kalman that similar episodes had occurred in the past.

¶ 31    Stacy Sims, a DCFS child protection investigator, testified that in January 2017, she was assigned to M.O.'s case and in February 2017, she implemented an out-of-home safety plan, with the consent of respondent, to ensure the safety of M.O. until the situation was stabilized. At that time, M.O. was hospitalized at Hartgrove Hospital. She informed respondent that she was still responsible for M.O.'s mental health care regardless of where he was living. Under the safety plan, respondent was to receive intact services, including therapy, mental health services, and domestic

violence services. Sims recommended therapy for M.O. and family therapy for both M.O. and respondent. The goal of the safety plan was to stabilize the situation and to avoid court involvement.

¶ 32    Sims testified that she investigated the sequence E and F hotline calls (which were considered companion cases), regarding reports that respondent had hit M.O. with a plastic bat. This report was corroborated by M.O., respondent, and a sibling. However, these investigations resulted in unfounded reports because M.O. had not sustained injuries and the family was cooperating with the safety plan. She further testified that the ultimate determination as to whether a report is unfounded or indicated lies with her supervisor.

¶ 33    On cross-examination, Sims testified that she did not observe any signs of abuse or neglect in regards to respondent's other five children.

¶ 34    Natlie Richmond, a DCFS child protection investigator, testified that on December 23, 2018, she investigated a hotline call regarding an allegation of risk of harm and injuries to M.O. inflicted by respondent. After the investigation, DCFS made a finding of indicated.

¶ 35    Richmond spoke to M.O. at his maternal great-grandmother's home. He reported that he went to a roller skating rink that evening with friends, and respondent punched and slapped him and hit him with a chair when she learned that he left the rink without a ride. He informed Richmond that when he left the rink, around 11 p.m., a group of men arrived in a car and began to punch M.O. They were attempting to force M.O. and his cousin into the car. He stated that he was punched in the chest, not in the face, but he managed to get away. His cousin was pulled into the car and M.O. called his uncle and the police. He then went to his siblings' paternal grandmother's home. Respondent learned that M.O. did not help his cousin and she began to punch and hit him. Respondent was still upset when they arrived home and she hit M.O. again. M.O. called the police.

¶ 36    Richmond also spoke with respondent on that same day. Respondent denied punching or hitting M.O. with her hand. Instead, she stated that she hit M.O. with a belt below the waist at their home. When Richmond asked to see the belt, respondent answered that she did not know where it was. Respondent stated that M.O. could have caused the injuries to his face himself. She did not inform Richmond that M.O. had spit on her. Respondent stated that she had a scratch on her face from the altercation but Richmond did not see a scratch. Richmond further stated that M.O. had a "slim build" and was shorter than respondent.

¶ 37    Richmond testified that DCFS decided to take protective custody of M.O. because of the history with respondent, the corroborating statements from other individuals, and respondent's prior indicated report and intact services.

¶ 38    On cross-examination, Richmond testified that she did not observe any signs of abuse or neglect in regards to respondent's other five children.

¶ 39    This concluded the State's evidence.

¶ 40    Respondent did not present any witnesses but offered one exhibit, which was admitted into evidence. The exhibit consisted of the answer to an interrogatory, stating that M.O. informed Carrie Seleman: "I was young, I didn't know the difference between getting a whooping or being disciplined and getting abused. I lied to DCFS people and said she inappropriately put her hands on me" and "All of this is for no reason, it was just a misunderstanding."

¶ 41    Following the hearing, the trial court determined that M.O. was abused based on a substantial risk of injury and neglected due to an injurious environment and a lack of necessary care. The court declined to make a finding of excessive corporal punishment. In its oral ruling, the court noted that Dr. Kalman, who was qualified as an expert, "testified to a reasonable degree of medical certainty that [M.O.] was abused." It further noted that there was an indicated report from

DCFS and evidence that respondent did not take M.O. to necessary medical and mental health appointments. The court found respondent's testimony to be "not very credible at all" where she remembered "some things specifically and other things she doesn't remember."

¶ 42    In the adjudication order, the court found that: the State's witnesses were credible whereas some of respondent's testimony was not credible; M.O. failed to receive proper mental health treatment; respondent had a prior indicated report; and M.O.'s statement regarding being hit by respondent was corroborated by respondent's admission that she had hit him.

¶ 43    Disposition and permanency hearings were held on April 20, 2022. At the disposition hearing, the following evidence was presented.

¶ 44    Brianna Marsh, a caseworker with Children's Home and Aid, testified that she was assigned to M.O.'s case and she last visited M.O., who was then 15 years old, at the nonrelative home where he was placed on April 13, 2022. She stated that the home was safe and appropriate; M.O. was doing well in school and was not on any medication. She did testify as to one reported altercation involving M.O. at school but it was unclear who the aggressor had been. She testified that M.O. was not receiving any services but she recently submitted a new referral for individual therapy for him.

¶ 45    As to respondent, Marsh testified that respondent had been engaged in individual therapy through Chatham for more than a year and her therapist reported that respondent understood why this court case was initiated. Marsh further testified that she visited respondent's home monthly. Respondent appeared overwhelmed with taking care of her five other children and she requested temporary placement for them. Additionally, at a recent Child and Family Team Meeting, respondent stated that she wanted to agree to a termination of her parental rights because she was

frustrated and did not want DCFS involvement anymore. Respondent later changed her mind and is still committed to working towards the return of M.O.

¶ 46     To her knowledge, M.O. and respondent spoke on the phone daily but had not had an in-person visit in several months, at least in part due to respondent's responsibilities to her other children. M.O. informed Marsh that he wanted to go home and that he was tired of DCFS involvement. She recommended that M.O. not be returned home that day and that the agency recommended wardship and guardianship for M.O. Before the agency would recommend return home, respondent would need to be successfully discharged from individual therapy, have supervised visits, and a staffing should occur to determine whether unsupervised visits were appropriate.

¶ 47     The trial court found respondent was unable to care for M.O. and it was in M.O.'s best interest to be placed in the custody and guardianship of DCFS. The court entered a dispositional order adjudging M.O. a ward of the court.

¶ 48     The court granted a motion for unsupervised day visits after a staffing was completed.

¶ 49     At the subsequent permanency hearing, Marsh testified that respondent had made substantial progress and the recommended goal was for M.O. to return home within 12 months. The court entered the permanency goal of return home within 12 months.

¶ 50     This appeal followed.

¶ 51                                      II. ANALYSIS

¶ 52     On appeal, respondent requests that the adjudication and disposition orders be vacated, arguing that (1) the findings of abuse and neglect, as opposed to dependency, were against the manifest weight of the evidence and, (2) the circuit court erred in excluding evidence arising after the filing of the petition for adjudication of wardship.

¶ 53                    A. Abuse and Neglect Findings

¶ 54    Respondent claims that the trial court's findings of abuse and neglect were against the manifest weight of the evidence. Rather than being abused or neglect, she asserts that M.O. was a dependent minor, through no fault of respondent. She further asserts that the trial court should have found her testimony credible and that M.O.'s injuries were not serious.

¶ 55    The purpose of the Act is to "secure for each minor subject hereto such care and guidance *** as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community." 705 ILCS 405/1-2(1) (West 2018). The Act sets forth the procedures the trial court must follow in determining whether a minor should be removed from his or her parents' custody and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462-63 (2004). The process is initiated when the State files a petition for wardship and the minor is placed in temporary custody. *Id.* at 462. From there, the trial court conducts an adjudicatory hearing, where "the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2018). If the trial court determines that a minor is abused or neglected at the adjudicatory hearing, the court then conducts a dispositional hearing. 705 ILCS 405/2-21(2) (West 2018). At the dispositional hearing, the trial court determines "whether it is consistent with the health, safety and best interests of the minor and the public that [the minor] be made a ward of the court." *Id.*

¶ 56    In this appeal, respondent only challenges the adjudication findings, not the dispositional order finding respondent unable to care for M.O. and making him a ward of the court. Accordingly, we confine our review to the adjudicatory proceedings and order. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (providing that points not argued are forfeited).

¶ 57    In adjudication proceedings, the State has the burden of proving allegations of neglect or abuse by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. Stated another way, the State must demonstrate that the abuse and neglect allegations are more probably true than not. *Arthur H.*, 212 Ill. 2d at 464. Significantly, the same evidence that supports findings of abuse can also support findings of neglect. *In re R.G.*, 2012 IL App (1st) 120193, ¶ 46. "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Arthur H.*, 212 Ill. 2d at 463.

¶ 58    The reviewing court is deferential towards the trial court's findings of fact because "the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence." *In re Sharena H.*, 366 Ill. App. 3d 405, 415 (2006). A reviewing court will not reverse a trial court's ruling of neglect unless it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 59    With these principles in mind, we turn to the merits of this case.

¶ 60    Here, the trial court found that M.O. was abused based on a substantial risk of injury and neglected due to an injurious environment and a lack of necessary care. These findings are each defined as follows.

¶ 61    Pursuant to section 2-3(2)(ii) of the Act, an abused minor includes a minor whose parent "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." It is sufficient that there be substantial risk of physical injury; actual injury is not required. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 35.

¶ 62    The Act defines a "neglected minor" as "any minor under 18 years of age *** who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being" or "whose environment is injurious to his or her welfare[.]" 705 ILCS 405/2-3(1)(a)-(b) (West 2018). 'Neglect' is defined as the ' "failure to exercise the care that circumstances justly demand." ' " *Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). "The term 'injurious environment' is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe nurturing shelter for her children." *In re M.D.*, 2021 IL App (1st) 210595, ¶ 24.

¶ 63    The State and the GAL maintain that the manifest weight of the evidence supports the trial court's adjudication findings of abuse due to substantial risk of injury, neglect due to injurious environment, and neglect due to lack of necessary care. We agree.

¶ 64    A review of the record shows that the State proved its allegations of abuse and neglect by a preponderance of the evidence. In 2017, M.O. was hospitalized at Hartgrove Hospital for suicidal thoughts. During his time there, the records show that he reported feeling unsafe in respondent's care and she had punched, slapped, and pushed him in the past. He also informed the staff there that there were times when respondent did not give him his prescribed medication. He was discharged to an aunt, who also reported on at least one occasion that respondent had not refilled M.O.'s prescription. Upon his discharge, DCFS also recommended intact services, to which respondent initially agreed. These services were to include counseling for both respondent and M.O. with the goal of avoiding court involvement in the family. Later, respondent refused to

participate, withdrew her consent, and threatened criminal charges against caseworkers if they continued to visit her home and contact M.O.

¶ 65    In October 2017, DCFS conducted an investigation based on a report that respondent had hit M.O. with a stick. The summary indicated that M.O. had a 2.5-inch scratch on his face as a result. DCFS concluded that this report was indicated where there was credible evidence to support the allegations. The summary of that report noted that respondent had failed to follow through with therapeutic services for herself.

¶ 66    Chatham counseling records show that M.O. missed over 20 counseling appointments between December 2017 and August 2018, at which time he was discharged for absenteeism. These records also show that respondent had three intake appointments scheduled for her own counseling but she never attended any of them.

¶ 67    In early 2018, there was a report of respondent hitting M.O. with a plastic bat. Although that report was ultimately considered to be unfounded, the investigator testified that respondent admitted to hitting M.O. with a bat and a sibling who was in the home corroborated the report. We acknowledge that M.O. did not sustain any injuries from that incident.

¶ 68    Finally, in December 2018, just prior to the initiation of this action, there was an altercation between respondent and M.O. that left M.O. with lacerations on his cheek and a lip abrasion. M.O. reported that respondent had hit him with a chair and also slapped, punched, and scratched him. The altercation stemmed from M.O.'s failure to call respondent after leaving the roller skating rink that evening. The narrative M.O. gave to the investigator was the same as that given to Dr. Kalman, the treating physician at the emergency department. Dr. Kalman observed the injuries on M.O.'s face and determined that they were nonaccidental and the result of physical child abuse based on

the "pattern" of his injuries which correlated with the history provided by M.O. and his grandmother.

¶ 69   Although respondent corroborated the narrative that she was "frustrated" and "worried" about M.O. when he did not call her that evening, she maintained that she did not punch, slap, or scratch him, but that she only hit him with a belt one time below the waist, and this was in response to M.O. spitting on her. However, she did not tell the investigator that M.O. had spit on her and she could not locate the belt when requested. The trial court did not find respondent's testimony to be credible.

¶ 70   This evidence supports a finding of abuse due to substantial risk of injury. The record shows that respondent used physical force against M.O. that caused injury to M.O. on at least two occasions, the most recent incident in 2018 resulting in injuries to M.O.'s face. Moreover, the evidence suggests that the situation between M.O. and respondent was often volatile and respondent was unable to deescalate situations. Respondent also failed to comply with intact services that may have helped to address these problems. Rather, the problems persisted despite the intervention of DCFS. There was clearly a substantial risk that respondent would cause physical injury to M.O. in the future. Additionally, respondent's failures in regards to M.O.'s mental health care and his medications also created a substantial risk of physical injury where M.O. had been psychiatrically hospitalized multiple times for suicidal ideation. Therapy and medication monitoring cannot be taken lightly in such a situation. As such, the trial court's finding of abuse was not against the manifest weight of the evidence.

¶ 71   This same evidence supports the finding of neglect due to an injurious environment. Respondent did not ensure a safe environment when she repeatedly used physical force against M.O., resulting in injury on occasion, and failed to take advantage of offered therapeutic services

to address the issues between herself and M.O. On multiple occasions, M.O. reported that he did not feel safe in respondent's care. As such, the trial court properly found neglect due to an injurious environment.

¶ 72 Finally, there was sufficient evidence to find neglect due to a lack of necessary care. The record demonstrates that M.O. required considerable mental health treatment where he had been hospitalized twice for suicidal ideation and his medical history showed that he was prescribed a number of medications to treat his ADHD and mood disorder. Despite M.O.'s obvious need for mental health treatment, respondent failed to ensure that M.O. was attending all of his counseling appointments and did not follow-up with M.O. and Chatham after they sent notice that he was going to be discharged due to absenteeism. Additionally, there is documentation in the record showing that respondent did not always provide M.O. with his prescribed medication. Although M.O. never lacked food or shelter, he did not receive the necessary mental health care due to respondent's failures. See *In re Adam B.*, 2016 IL App (1st) 152037, ¶ 38 ("A child who does not receive appropriate medical evaluations or care is neglected."). Accordingly, the trial court's finding of neglect due to a lack of necessary care was not against the manifest weight of the evidence.

¶ 73 Nonetheless, respondent contends that if her version of events had been accepted, there could be no findings of abuse or neglect. Here, the trial court found respondent's testimony was not credible. We will not disturb this finding where the opposite conclusion is simply not "clearly evident." During her testimony, respondent was unable to remember where M.O. was living at various points in time and she did not know what his medical diagnosis was or what medication he was on. She also did not know what her own medical diagnosis was, what medication she had been prescribed, or when she had last taken her medication. She asserted that she hit M.O. with a

belt but could not remember where the belt came from or where it was when the DCFS investigator arrived later that evening. She also denied hitting M.O. with a plastic bat, although she admitted to doing so at the time of the investigation of that incident. Finally, she asserted that she did whatever DCFS told her to do, in regards to intact services; however, this assertion is belied by the exhibits in the record which show that she not cooperative and refused to participate in the recommended therapeutic services. Based on the inconsistencies in respondent's testimony as well as her failure to recall salient details about M.O.'s life, such as his mental health history or where he was living at various points, it was reasonable for the trial court to find respondent not credible. See *In re D.F.*, 201 Ill. 2d 476, 499 (2002) (A reviewing court must not substitute its judgment for that of the trial court in regards to the credibility of witnesses.).

¶ 74    Additionally, respondent asserts that the finding of abuse is against the manifest weight of the evidence because the injuries to M.O.'s face were superficial and he was never at risk of serious injury. We reject this argument. A serious physical injury is not a prerequisite for a finding of substantial *risk* of physical injury. Here, the record showed that respondent had a history of threatening and violent behavior towards M.O., M.O.'s mental health needs were not being met, and M.O. had previously been hospitalized for suicidal ideation. The totality of these circumstances presented a situation where M.O. could be found to be at substantial risk of physical injury, which could cause impairment of his emotional health.

¶ 75    We also reject respondent's argument that the trial court should have considered her behavior to be reasonable corporal punishment for M.O.'s misbehavior. Respondent's physical reactions towards M.O.'s minor infractions were out of proportion. The trial court remarked on this in its oral ruling, stating: "Just because a child doesn't call you with a cell phone like how you wanted him to is not a reason to hit your child." Moreover, the alleged corporal punishment left

visible injuries on M.O., which were sufficiently severe for Dr. Kalman to make a finding of child abuse. "Corporal punishment given in a concerned, caring manner is not abuse and is not neglect." *In re S.M.*, 309 Ill. App. 3d 702, 706 (2000). Such is not the case here where respondent's behavior towards M.O. demonstrated a lack of care for his physical and mental wellbeing.

¶ 76 Finally, we turn to respondent's affirmative defense of no-fault dependency. Respondent argues that there was evidentiary support in the record for her defense in that she made efforts with respect to M.O.'s appointments but that he did not always cooperate; M.O. had behavioral issues including defiance and anger; and these issues persisted even when outside of respondent's care. We disagree.

¶ 77 The Act defines a dependent minor, in relevant part, as a minor "who is without proper medical or other remedial care recognized under State law or other care necessary for his or her well being through no fault, neglect or lack of concern by his parents." 705 ILC 405/2-4(1)(c) (West 2018).

¶ 78 In support of her argument, respondent directs our attention to *In re Christopher S.*, 364 Ill. App. 3d 76 (2006). In *Christopher S.*, the petition for wardship of the minor was based on allegations that the minor had been "locked out," specifically that his adoptive parents had refused to pick him up from the psychiatric hospital following his discharge and refused to allow him back into their home. *Id.* at 79. The respondents informed the DCFS investigator that the minor was out of control and threatened violence against the family. *Id.* The respondents attempted to arrange for the minor to reside at Mercy Home, for which they would pay, but Mercy Home denied the minor admission. *Id.* The respondents eventually found a biological aunt to care for the minor. *Id.* At the adjudicatory hearing, there was extensive evidence regarding the minor's behavioral problems, which included aggression, violence, and criminal acts. *Id.* at 79-81. The respondents attempted to

arrange alternative housing, as well as therapy for the minor, but nothing was successful. *Id.* After the lockout, the respondents continued to assist the minor in finding housing and treatment; in fact, the respondents contacted over 40 different residential placement homes on the minor's behalf. *Id.* at 83. The trial court found that the minor was dependent through no fault of the respondents, and on appeal, this court affirmed the finding of no-fault dependency. *Id.* at 84, 88-89. Specifically, this court found that the respondents showed "great parental concern for [the minor's] well-being" and "respondents made every effort to arrange an alternative care they could afford." *Id.* at 89.

¶ 79 We do not find the facts of *Christopher S.* analogous here. We recognize that the respondents' efforts in *Christopher S.* were exceptional and may not be as feasible for all parents depending on their particular circumstances. However, as we explain below, we cannot say that respondent here made every reasonable effort available and offered to her to keep her family intact. See *In re Diamond M.*, 2011 IL App (1st) 111184, ¶ 27 (distinguishing *In re Christopher S.* because "[t]here is no evidence in the record that respondent made any remotely comparable efforts to find a residence for [the minor.]").

¶ 80 In *In re S.W.*, 343 Ill. App. 3d 445, 452 (2003), to which respondent additionally cites, is distinguishable as well. There, this court found that the trial court's dependency determination was not against the manifest weight of the evidence. The evidence at the adjudicatory hearing showed that the minor had been diagnosed "with intermittent explosive disorder, [ADHD], pervasive developmental disorder, and mild to moderate mental retardation" and she had been hospitalized multiple times for aggressive destructive behavior and threatening to kill her mother. *Id.* at 448-49. There was extensive evidence that the minor was frequently aggressive, hit her mother as well as hospital personnel, and put her own safety at risk. *Id.* at 449. There was also testimony that the minor could not take care of her own hygiene needs and she required residential care. *Id.* In

contrast, here, M.O.'s behavioral problems, which have not been overlooked, were not nearly as extreme as those of the minor in *S.W.* and at least two of M.O.'s hospitalizations were related to his thoughts of suicide. There was also no testimony that M.O. required residential care or that his behavior was uncontrollable.

¶ 81    Ultimately, respondent's argument is untenable in light of the evidence presented at the adjudicatory hearing. In particular, the exhibits submitted to the court showed that M.O. was a no-show at numerous counseling appointments and it was respondent's responsibility to ensure that he attended those appointments. Multiple notices were sent to respondent regarding M.O.'s absences, and eventually this became such a problem that Chatham had to discharge M.O. due to absenteeism. At the time of the hearing, respondent was not aware of M.O.'s diagnoses of ADHD and mood disorder or the medications he was prescribed. Further, the record showed instances where M.O. did not have his prescribed medications because respondent had not refilled his prescriptions or given the medication to the family member caring for M.O. There was evidence in the record that respondent was not cooperative with DCFS and the intact services that were recommended to her, such as individual therapy. Eventually, she refused to participate and revoked her consent for intact family services. There were also notes in the record indicating that respondent threatened to file criminal charges against caseworkers if they did not stop contacting her or M.O. because she had revoked consent. This evidence suggests that respondent had not made reasonable efforts to provide the necessary care for M.O. As such, it was not improper for the trial court to reject respondent's affirmative defense of no-fault dependency.

¶ 82    Accordingly, we reject respondent's arguments and conclude that the trial court's findings of abuse and neglect were not against the manifest weight of the evidence.

¶ 83                                B. Motion *in Limine*

¶ 84    Respondent next argues that the trial court abused its discretion in barring evidence arising after the filing of the petition. Specifically, in her motion *in limine*, she sought to present evidence of foster home disruptions in 2019, M.O.'s current enrollment at an alternative high school, M.O.'s continuing need for psychotherapeutic services, and M.O.'s August 2021 sentence of probation for public disturbance and resisting arrest in Indiana, and she made offers of proof to support her motion. Respondent contends that this evidence would have bolstered her position that the proper result was no-fault dependency because it demonstrated the ongoing nature of M.O.'s issues despite no longer being in respondent's care.

¶ 85    Generally, evidentiary motions, such as motions *in limine*, are subject to the trial court's discretion. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); see 705 ILCS 405/2-18(1) (West 2018) (the rules of evidence in the nature of civil proceedings are applicable to adjudicatory hearings under the Act). A trial court's evidentiary rulings on such motions will not be disturbed absent an abuse of discretion. *Id.* "A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." *In re A.W.*, 397 Ill. App. 3d 868, 873 (2010).

¶ 86    "All evidence must be relevant to be admissible." *In re Rayshawn H.*, 2014 IL App (1st) 132178, ¶ 32. "Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable." *Id.* Additionally, there is no "bright-line post-petition test for admissibility." *In re Edricka C.*, 276 Ill. App. 3d 18, 32 (1995).

¶ 87    We find *In re Rayshawn H.*, 2014 IL App (1st) 132178, instructive here. In that case, this court found that the trial court did not abuse its discretion in excluding postpetition evidence from the minor's therapist and other staff at the minor's residential placement facility where he was placed after the State filed the petition. *Id.* ¶¶ 34-35. The mother sought to admit this evidence to

show that she was not neglectful, that the minor had a psychiatric condition prior to being taken into temporary custody, and that the minor should have been placed in a residential treatment facility sooner. *Id.* ¶ 33. This, she claims, would support her claim that the minor was dependent through no fault of her own. *Id.* In excluding the evidence, the trial court found that the evidence was not relevant to the issues of the minor's behavior before DCFS took custody of him. *Id.* The court stated that the postpetition evidence concerned "behavior that may have been influenced by other factors; and it doesn't necessarily mean that one way or another, the minor's behavior before, necessarily conformed to what the behavior was afterwards."

¶ 88    We first recognize that, as respondent points out, the mother in *Rayshawn H.* failed to make an offer of proof regarding the proposed testimony, as opposed to the case before us where respondent did make the requisite offers of proof. However, this court did not end its analysis there and we find its reasoning applicable here.

¶ 89    In finding that the trial court did not err, this court explained that the proffered postpetition evidence "may have provided one possible explanation for [the minor's] troubled behavior, but bore no relevance as to whether [the mother] sought alternative placement or a care plan for [the minor] at the time she refused to allow him to return home." *Id.* ¶ 37. The court continued that the evidence "did not absolve" her failure to create a care plan with DCFS and her failure to participate in the DCFS support services that were repeatedly offered to her. *Id.*

¶ 90    Similarly, here, respondent sought to admit evidence of disruptions during M.O.'s foster care placement in 2019, M.O.'s recent enrollment in an alternative high school, his continuing need for psychotherapeutic services, and his Indiana sentence of probation for public disturbance and resisting from August 2021. Although this evidence may tend to show that M.O.'s behavioral problems persisted after the petition was filed, it does nothing to defeat the allegations that

respondent was, at least to some degree, at fault for M.O.'s lack of proper mental health care prior to the petition being filed. As in *Rayshawn H.*, the continuation of M.O.'s troubling behavior did not absolve respondent of her failures to ensure M.O. was receiving the requisite mental health treatment and to participate in DCFS intact services to address her own mental health issues. Moreover, the record before the court was not lacking in documentation of M.O.'s behavior even outside of respondent's care, whether it was at school, at the hospital, or in the care of relatives. There was extensive information before the court regarding M.O.'s behavioral problems.

¶ 91    Finally, we reject respondent's reliance on *In re Edricka C.*, 276 Ill. App. 3d 18 (1995). She contends that, pursuant to *Edricka C.*, the trial court's exclusion of the evidence was in contravention of the prohibition against a bright-line rule that all postpetition evidence is irrelevant. In *Edricka C.*, this court concluded that the trial court had erroneously established a "bright-line rule" that all postpetition evidence was irrelevant to the adjudicatory hearing. The proffered evidence was that after the petition was filed, the minor tested negative for an alleged blood disorder. 276 Ill. App. 3d at 31. This court determined that the evidence was indeed relevant to disprove the allegation that the child was medically neglected. *Id.* The evidence there affirmatively refuted allegations in the petition. The same cannot be said here, and the result in that case does not alter our conclusion here that the postpetition evidence was irrelevant. Our holding does not run afoul of the principle set forth in *Edricka C.* that postpetition evidence should not automatically be excluded. We have not applied a bright-line test. Rather, we have concluded that the evidence was not relevant and did not relate back to the allegations in the petition.

¶ 92    Finally, we reject out of hand respondent's assertion that retrospective fitness hearings are analogous to the admission of postpetition evidence at an abuse and neglect adjudicatory hearing. Specifically, she points to *People v. Garcia*, 2015 IL App (1st) 131180, ¶¶ 30-39, where there was

no question of admissibility of evidence gathered several years after his trial to adduce whether defendant had been fit to stand trial. There, the defendant, who was convicted in 2001, had a postconviction evidentiary hearing that included testimony from doctors who, in addition to reviewing documents from 2001, had interviewed defendant in 2008 and 2010. *Id.* However, this is a civil proceeding, as opposed to a criminal one, and the constitutional bar to the prosecution of a defendant who is unfit to stand trial is irrelevant and not implicated here. Moreover, postconviction evidentiary hearings are disparate proceedings serving different purposes and governed by different standards.

¶ 93    Accordingly, the trial court's denial of respondent's motion *in limine* was not an abuse of discretion.

¶ 94                                    III. CONCLUSION

¶ 95    For the reasons stated, we affirm the judgment of the circuit court.

¶ 96    Affirmed.